November Term, 1881.

HAND v. SAVANNAH AND CHARLESTON RAILROAD
COMPANY.

THE STATE, *EX RELATIONE* THE ATTORNEY GENERAL, v.
SAME.

*EX PARTE* CUTTINGS, EXECUTORS, *IN RE* THE SAME.

1. The decision of this court in *Hand* v. *Savannah and Charleston Railroad Company*, 12 *S. C.* 314, declared and explained, so far as it determined the respective priorities of the bonds of the defendant corporation, and held *persons* funding coupons under the act of 1869 estopped from claiming a prior lien under the act of 1856 for the bonds and other coupons owned by them *at the time of such funding.*

2. Under an issue of estoppel from the assertion of a preferred statutory lien, the question whether the holder of bonds and coupons secured by such lien has accepted, in payment of his past-due coupons, bonds issued under a later statute postponing such lien, is one of fact, with the burden of proof resting upon him who asserts the estoppel.

3. On such question, arising eleven years afterwards, entries in the handwriting of a deceased treasurer in the regularly-kept books of a railroad company are competent evidence to show who funded coupons and received in exchange therefor bonds under the later statute.

4. And such persons, or their representatives, having failed, after opportunity offered, to show that they were not at that time owners of the bonds and coupons (then immature) of the first lien, now produced by them, such evidence will be accepted as proof that they were such owners at the time of the funding by them of coupons, then past due, of first lien bonds,—the company being in possession of coupons from those bonds, although it cannot be shown that they are the identical coupons funded by these persons.

5. But the mere fact that coupons of the bonds now presented were funded in 1869 do not furnish that full and clear proof essential in estoppels, to establish the ownership of these bonds at that time by the same parties who did the funding.

6. The present owners of bonds may have acquired them prior to 1869 without the coupons, but if afterwards, the act of that year did not charge them with notice that the coupons cut off had been funded by parties then owning the bonds from which cut.

7. The fact that some coupons of first-lien bonds were paid in state guaranteed bonds under the act of 1869 raises no equity for the payment of the unfunded coupons of the same class and dates in preference to the bonds and later coupons. Such unfunded coupons are entitled to take only their *pro rata* with other bonds and coupons of the first lien not postponed by settlement or the estoppel of their owners.

8. The holders of first-lien bonds retaining that rank are exclusively entitled to the benefit of the first lien, and cannot be required to share that benefit with the second statute lien to the extent of the quantity of the first lien removed by the estoppel of parties holding under it. This was in effect held in the former judgment, 12 *S. C.* 314.

9. Nor (as also ruled in the former appeal) are the interest fund bonds, guaranteed by the state, issued under the act of 1869 in payment for the coupons of the first-lien bonds, entitled to the rank held by the coupons which these bonds satisfied.

10. A referee having reported a schedule of coupons proved before him, and the report in this particular having been confirmed, without exception, on Circuit, and then on appeal, it is too late afterwards to raise the point on Circuit that certain coupons included in such report had been before that time paid by the debtor corporation—that matter being necessarily involved in the proof of the coupons. The rule is not varied where other issues involved in the litigation are still undecided.

11. The application for a recommittal cannot be sustained under the act to vacate erroneous judgments, because not made within two years; nor under Section 197 of the code; nor as for a new trial on after-discovered evidence, for the reason that the *remittitur* of the Supreme Court had been issued.

12. Uncancelled coupons having been taken up by parties who advanced the money to an embarrassed corporation for that purpose—although marked paid in the company's books—these parties have an equity to claim for their coupons the benefit of the lien which originally secured them. The recognition of this equity may be required at the hands of persons seeking the equitable powers of the court to enable them to contest the liability of the company to pay these coupons.

13. Claims against the receiver of an insolvent railroad corporation for moneys, services, supplies, damages, and necessary expenses of the management, cannot be paid out of the proceeds of the mortgaged property, which were insufficient to pay the mortgage debt. Unless specially authorized by the court to contract debts on the faith of the property, a receiver is restricted to the income and profits of the road.

14. The receiver was authorized by a consent order, without a reference, to construct an extension of the railroad at a cost not to exceed an amount stated, to be paid for out of surplus income, and the extension to stand pledged for such payment. The extension was built at a greater cost and then sold as a part of the entire road. *Held,* that the receiver acted only as agent of the consenting bondholders, but that the extension was covered by a lien, superior to existing liens, in favor of those who furnished the money to build it, and that they were entitled to such ratable proportion of the proceeds of sale as the value of the extension bore to the value of the entire road, considered only in reference to the purchase money of the whole.

15. But a bondholder refusing to consent to the extension, and whose interest was expressly excepted in the consent order, is entitled to his full share of the whole proceeds of sale.

16. Counsel fees and costs should be adjusted on Circuit. The costs and fees of all the attorneys, properly chargeable for successful services, should be paid out of the common fund.

17. It being impossible to say with judicial certainty what was adjudged in the former judgment of this court (12 *S. C.* 314), upon the matter of the liability of the railroad for taxes, the question treated as still undetermined.

18. A railroad company was chartered with an exemption from taxation, and bonds were issued having a first statutory lien on the property of the corporation. Subsequently the general assembly passed an act undertaking to postpone the first lien in favor of a second issue of bonds by that act authorized, upon condition that the corporation would release its exemption from taxation—which was done. The postponement of the lien being unconstitutional, *held*, that as to bondholders under the first lien, who did not assent to the terms of the second act, the property of the corporation in the hands of the original company and also in the hands of its successor, a new company, was exempt from taxation.

Before MACKEY, J., Charleston, March, 1881.

For the previous history of these cases in this court, see, in the following order, 5 *S. C.* 182, 8 *Id.* 207, 6 *Id.* 307, 10 *Id.* 406, 12 *Id.* 83, 314, 13 *Id.* 467; but most particularly, 12 *S. C.* 314, to the opinion in which case frequent reference is here made.

Upon the return of the case to the Circuit Court, Judge Aldrich passed the order of reference stated in the opinion of this court. It is contained in his decree of sale, set out in full in 13 *S. C.* 467. The referee reported as follows:

It will be necessary, in the first place, to determine what are the principles settled by the Supreme Court. On page 350, the court, after discussing the subject, sums up its conclusion in these words: "It would follow that one funding coupons under that act (1869) must be regarded as bound by its terms, as it regards any bonds or coupons held by him at the time of funding of the same class, at least with the coupons funded."

This seems precise and definite. In the next subsequent paragraph of the decision the court designates this as "this principle," and as "the conclusions just stated," and as "the

principle laid down." It would not be within the province of a mere referee to extend the application of this precise rule and direction beyond its express terms, by any analogies or arguments drawn from the reasoning by which the court has reached the above conclusion. My interpretation of this conclusion is that that bondholder only who has funded the coupons from the bonds which he held at the time of the funding must be regarded as bound by the terms of the act of 1869, as it regards any bonds or coupons held by him at the time of funding of the same class, at least with the coupons funded. And that if any estoppel arises, it arises from the personal act of the party funding, and not from the character of the instrument.

The following is a summary of the evidence which has been submitted in the case :

First. The coupons either funded or paid, in the possession of the Savannah and Charleston Railroad Company. These coupons are contained in nine books, embracing the years 1861 to 1869, both inclusive. The coupons in these books are variously marked, some of them are punched and others are marked with a cross. The evidence of Messrs. Isaacs, Blacklock and Lee, which accompanies this report, will explain the circumstances and conditions of these coupons. I submit with this report a tabular statement, marked Appendix A, of all the six per cent bonds which have been issued under the act of 1856, for the above period, together with the names of those persons who have proved them either at the reference held under the present order, or at the references hitherto held, together with the statement of the condition of all the coupons on those bonds as far as such condition has been ascertained by the proof submitted. This statement shows what coupons are in the possession of the Savannah and Charleston Railroad Company and are presumed to be either funded or paid, and what coupons are held by different holders and are neither funded nor paid.

There is nothing upon the face of the coupons in these nine books to show by whom any of the funded coupons have been funded, nor to whom payment has been made for any of the

paid coupons. The fact of the possession of these coupons by the company is proof simply that such coupons have been either funded or paid by the company. It has been argued that the fact of the possession by the company of a coupon of any particular bond is presumptive that the coupon was funded by the holder of the bond, and that the burden of proof is upon him to show that he did not fund the coupon.

But there is better and more conclusive evidence as to who funded the coupons than is furnished by any presumption arising from the mere possession by the company of the coupons. The books of the company, if they are to be received as evidence, furnish precise and accurate evidence as to who did actually fund the coupons and receive the bonds for which such funded coupons were issued.

These books, two in number, are marked as follows: "Statement of coupons from state guaranteed six per cent bonds, funded in state guaranteed seven per cent bonds, S. & C. R. R. Co.;" and "Bonds issued for funded interest. State guarantee. S. & C. R. R. Co." The entries contained in them are printed with the evidence filed with this report.

They are in the handwriting of Mr. S. W. Fisher, the treasurer of the company, at the time of the funding, and were contemporaneously prepared by him in the course of his employment, to serve, as·is shown by the titles printed on them, as the official register and record of the funding, and with such accuracy and care as to leave but little, if any, room for discredit or doubt. Mr. Fisher is dead, and the books come fairly within the rule as laid down by Mr. Wharton in his "Treatise on Evidence," Sec. 238.

These books contain the names of all those to whom the bonds for the funded coupons were issued, and it is impossible to avoid the conclusion that those whose names appear on them did personally fund either coupons from the bonds which they at that time personally held, or coupons which they obtained from others.

If, therefore, it is proved by any evidence submitted in this case that a person is a holder of a six per cent bond, and the name of the same person appears in the books of the company

as one of those who have received a bond for funded interest, such concurrence and coincidence would be at least presumptive that the bonds which he now holds are the bonds which he held at the time he funded the coupons, and the burden of proof is upon him to show that he did not hold the bonds which he now holds at the time of the funding.

And if it should appear that the name of a present holder of a six per cent bond does not also appear in the books of the company, such non-appearance would be presumptive, if not conclusive, that the present holder of the bond was not the holder at the time of the funding, or that the coupons of his bonds were sold and not personally funded by him; since, with the exception of twelve bonds held by Mrs. Blair's estate, there are no bonds, some of the coupons of which are not in the possession of the company, and the names of all the parties who funded appear in the books of the company. The bonds being negotiable securities are not affected by any transactions of which the present holder has had no notice, and the present possession of such a bond is at least *prima-facie* evidence that such possession is *bona fide* and without notice of any equities affecting it.

The following is a comparative table, containing the names of all the parties who have received funded interest bonds, and those who in the same or nearly the same names have proved six per cent bonds in the cause: . . .

No such proof has been submitted as would show an identity in persons and interest in the following names in the above list, and, therefore, the bondholders cannot be presumed to have accepted the provisions of the act of 1869 : . . .

The other parties mentioned in the above comparative table who have received interest funded bonds and have proved six per cent bonds, must be presumed to have accepted the provisions of the act of 1869, so far as the six per cent bonds are concerned, which they held at the time of the funding, and the burden of proof is upon them to show what bonds they did not hold at the time of funding.

The following parties have testified as to what bonds they did not hold at the time of funding: . . .

The holders of six per cent bonds who have not been proved

to have funded coupons, cannot be presumed to have accepted the provisions of the act of 1869.

Besides the six per cent bonds which have been proved before me in this case, there have also been proved a number of detached and unpaid coupons, taken from the six per cent bonds. The following is a list of these coupons and the names of the parties who have proved them: . . .

None of the above parties have been proved by the books kept by Mr. Fisher, or by other testimony, to have received any of the interest funded bonds, with the exception of Mr. J. T. Robertson and Mr. A. Isaacs.

With their exception there is nothing to raise a presumption that any of the above parties have in any way accepted the provisions of the act of 1869. Mr. Robertson and Mr. Isaacs having been proved to have received interest funded bonds, the burden of proof is on them to show that they did not hold the coupons they have proved at the time they received the interest funded bonds.

It has been argued that all the past-due coupons held by the above parties, and maturing on or prior to first September, 1869, should be paid before coupons falling due at a later date, and before the principal of any of the bonds. In support of this position, the case of *Stevens* v. *New York and Oswego R. R.*, 13 *Blatch.* 416 (Jones R. R. Sec., § 638), was relied on. This case seems directly on the point, and if its authority is to be followed, the coupons above referred to must be paid before the other coupons and the principal of the bonds.

It would be as well to state that all of the six per cent bonds issued under the act of 1856 have been proved before me, with exception of seventy-one bonds. And that all the coupons belonging to the six per cent bonds, for the nine years from 1861 to 1869, have been accounted for or proved except 564.

The following statement of the coupons will make this apparent: . . .

Entire interest for the 9 years.................$272,700 00
Accrued interest according to Mr. Fisher......... 268,470 00
Amount of interest paid, but not in Mr. Fisher's ———————
    statement..................................... $4,230 00

Reducing the amount of interest according to Mr. Fisher's evidence, on page 209 of the brief to coupons, the following would be a statement of the entire interest in coupons:

Whole amount of coupons ($272,700) ...............18,180
$   4,230 paid ...................... 282 coupons
$ 20,145 paid by Mr. Fisher.......... 1,343   "
$172,800 funded by Mr. Fisher........11,520   "
$ 67,065 held by Hand and others .... 4,471   "
$   8,460 in unproved coupons ........   564   "      18,180

$272,700

The next evidence submitted is that of Mr. Alexander Isaacs, the former president of the company. He merely corroborates the evidence of Mr. Fisher, and does not prove the funding by any one whose name is not in the books kept by Mr. Fisher.

The order of reference under which I am acting directed that I should inquire and report "what claims and demands against the Savannah and Charleston Railroad are undisputed and entitled to immediate payment." The following claims against the road have been presented, none of which however are undisputed:

1st. The claim of Henry R. Williams for land taken by the Charleston and Savannah Railroad Company for a right of way in 1860.

2d. The claim of the state for taxes.

3d. The claim for materials, labor, and services up to the time of the sale of the road, and paid by Mr. Mitchell and the receiver.

4th. The claim of Daniel Green for a horse killed and injuries to a mule.

In reference to the claim of Henry R. Williams. . . .

As to the claim of the state for taxes :

In a former report the referee reported that the claim of the state for taxes was, under the act of 1856, postponed to the lien of the bondholders under that act. To this report the attorney-general of the state filed exceptions, among which was this : " That the referee erred in not finding that the claim

of the state for taxes constitutes a lien on the property of the Charleston and Savannah Railroad Company, prior to all other liens and claims on the same." The Circuit Court confirmed the report on this point, and from the decree of the Circuit Court the attorney-general appealed on the same grounds on which he excepted to the report. Subsequently the Supreme Court decided as follows: " That portion of the decree (Circuit) which sustains the imposition of the taxes should be affirmed." It would, therefore, appear that the imposition of the taxes is postponed to the lien of the bondholders under the act of 1856, as the Circuit Court confirming the report had decreed; and as the road has not been sold for a sufficient amount to pay the bondholders under the act of 1856, the claim of the state for taxes must be disallowed.

In reference to the claims due by the receiver :

The order of reference relating to these claims requires me to vouch the said claims, and to inquire and report upon what funds the same are chargeable.

I find in the order appointing the receiver, signed April 28, 1874, the following provision : " The said railroad stock, outfit, and property of the defendant company shall be held, worked, and managed by the said receiver and advisory board, with the greatest possible skill and economy, and the results be reported quarterly to the court in this cause, and the net profits, after paying all necessary expenses, including such amounts, if any, as may be due the employees and officers, shall be applied quarterly to the payment" of the interest and principal of the debt of the company, in the order set down in the order appointing the receiver.

It would require a very liberal construction of this order to interpret it, as intended, that the necessary expenses, including the amounts due the employees and officers for services, should be paid out of any other fund than the profits of the road. If the amounts now due by the receiver are at all chargeable upon the fund arising from the sale of the road, now in the hands of the court, such chargeability must arise from some other authority than that contained in the order appointing the receiver. The general accounts of the receiver have not yet been

audited and vouched, nor does it appear that he has not worked and managed the road with all possible skill and economy.

In the case of *Cowdrey* v. *Railroad Company*, 1 *Wood's Rep.*, 336, Mr. Justice Bradley says : "It may be laid down as a general proposition, that all outlays made by the receiver in good faith, in the ordinary course, with a view to advance and promote the business of the road, and to render it profitable and successful, are fairly within the line of discretion that is necessarily allowed to a receiver intrusted with the management and operation of a railroad in his hands. His duties and the discretion with which he is invested are very different from those of a passive receiver, appointed merely to collect · and hold moneys due on prior transactions, or rents accruing from houses and lands.

"And to such outlays in ordinary course may properly be referred not only the keeping of the road, buildings, and rolling stock in repair, but also the providing of such additional accommodations, stock, and instrumentalities as the necessities of the business may require, always referring to the court or to the master appointed in that behalf for advice and authority in any matter of importance which may involve a considerable outlay of money in lump."

There does not appear to be anything in the claims due by the receiver in these accounts, now under consideration, which may not be legitimately embraced in the principle thus laid down by Judge Bradley. There has been no considerable outlay of money in lump, and all the expenditures are of such a character as were necessary for the very continuance of the business and existence of the road, as explained in the evidence filed with this report.

In the matter of the claim of Daniel Green for a horse killed and a mule injured by the train:

I find that some time in the month of April, 1880, the horse and mule belonging to Daniel Green strayed on the track of the road, and were run over by a passing train. The horse was killed and the mule was so injured as to be entirely useless. The horse was purchased in March, 1879, for $110, and the mule in January, 1877, for $150.

In *Davenport* v. *The Receivers of the Alabama and Chattanooga R. R. Co.*, 2 *Wood's Rep.*, 519, it was decided "that a person who has recovered judgment against the receiver of a railroad for injuries received by him while travelling as a passenger upon the road, is not entitled to payment out of the earnings of the road nor the proceeds of its sale in preference to the first mortgage bondholders, unless it is so provided by the order of the court placing the road in the possession of the receiver." As there is no such provision in the order of the court which has placed the road in the hands of the present receiver, I therefore report that Daniel Green, under the principles of the above decision, is not entitled to compensation for the death of and injury to his animals out of the fund in the hands of the court.

Respectfully submitted,<br>W. ALSTON PRINGLE,<br>*Referee.*

The facts connected with the motion to recommit for further proof of the coupons of Isaacs and others, and the application for payment of the Bee Ferry Extension, are sufficiently stated in the opinion.

The case was argued before the Circuit judge on exceptions to the referee's report. The decree was as follows:

These cases came up on the referee's report, made under the direction of the Supreme Court and exceptions thereto. The Supreme Court had established the priority of the Statutory Lien of 1856, securing the six per cent bonds, but held that that lien was displaced in behalf of the seven per cent bonds of 1869, in cases where the coupons of the sixes had been funded under the act of 1869, and the case was sent back to inquire and report upon this and other matters set forth in the decree.

As the testimony is of considerable extent, and embraces various propositions upon which exceptions are taken, it will be more convenient to take up the various cases made in their order.

1. As to Hand's coupons. These form the subject of the original suit, and have been duly proved. They are six per cent

coupons matured and held by the plaintiff, Hand, before the passage of the act of 1869. The referee has found that these coupons, amounting to $27,705, with interest from their various dates, are justly due, and stand as *res judicata* under previous proceedings, and the exceptions having been withdrawn, it is ordered that Daniel Hand have judgment for the said amount, with interest, to rank to be paid in like manner as bonds which have not lost priority by acceptance of the act of 1869.

2. The twelve (12) six per cent bonds proved in the name of W. C. Beaty, executor of Mrs. Nancy Blair, have not been impugned by any testimony, and it is ordered that these bonds, amounting to $6000 with the interest accrued thereto, be also paid in like manner.

3. The one hundred six per cent bonds, and their coupons, and the detached coupons proved by Bradley Martin, have been removed by sufficient testimony from the presumptions which affect the other six per cent bonds, and it is ordered that these bonds amounting to $50,000, and detached coupons amounting to $25,005, with interest accrued thereon, be also paid in like manner.

4. The whole of the remaining six per cent bonds seem to me to fall within one class. The act of 1869 requires the Savannah and Charleston Railroad Company to fund the coupons on the six per cent bonds which shall have fallen due in September, 1869, and the Supreme Court has declared that all bondholders whose coupons have been so funded have accepted the provisions of the act of 1869, one of which provisions is, that they shall be postponed to the seven per cent bonds authorized by that act.

The Supreme Court further holds that the bond and its coupons forming a single obligation are to be considered as one. The coupons and bonds were certainly one paper originally, and necessarily in the same hands. On the principle of continuity, as set forth by Mr. Wharton *On Evidence*, 1284, when a judicial relation is once established, it is not necessary to prove its continuance. The burden is on the adversary to prove that it

has ceased. And, in accordance with this view, it has been decided that the possession of the coupon is *prima-facie* evidence that the holder of the coupon owns the bond from which it was taken. *McCay* v. *Washington*, 3 *Wall. Jr.* 381; *Moran* v. *County Comrs.*, 6 *Ohio St.* 287.

It follows in all cases where the coupons that have matured at or before September, 1869, have been funded under the act of 1869, the bond to which that coupon belongs is *prima facie* to be held bound by this Act of funding. The company is in possession of and had funded coupons of every bond issued except those of Mrs. Blair; and of those, the only parties who have made proof which rebuts the *prima-facie* evidence of acceptance is the holder of the Bradley Martin bonds, hereinbefore allowed. The result is, that all the six per cent bonds, with the foregoing exceptions, are postponed to the sevens issued under the act of 1869.

It is objected, however, that these bonds in the hands of an assignee, are protected from this infirmity of title by the Law Merchant. But it seems to me that the case of *Furman* v. *Nichol*, 8 *Wall.* 51, completely answers this objection. The public statute of 1869 required the railroad company to fund the coupons of 1869, and the court has declared the effect of that funding. The bond therefore, according to *Furman* v. *Nichol*, had this condition as it were written on its face, and whoever took it was affected with notice. The very absence of the coupons from the bond was absolute knowledge to the assignee that the coupons had been funded. It would seem to me that the act of 1869 itself took the bond away from the operation of the Law Merchant.

That act proposed a great public measure and prescribed the mode of carrying it out. If any one could defeat it by the simple transfer of the bond which had been postponed it would amount to the merest trifling, and it is far more consistent with public interest and justice to hold that, so far as this act is concerned, these bonds were excepted from the operation of the Law Merchant. Upon the whole I am of opinion that all the six per cents which have not been removed as above

set forth from the presumption created by the *prima-facie* proof are postponed to the sevens according to the provisions of the 6th Section of the act of 1869.

5. The question is here raised by one of the exceptions as to the relations to exist between the seven per cent bonds and those of the sixes which have not lost the benefit of the act of 1856 by acceptance of act '69. The sixes which are thus saved are only entitled to their relative share of all the sixes, and the postponement of their fellows cannot justly be made to give them any increased advantage. The sixes which are postponed in behalf of the sevens and the sevens will therefore take their place. Thus, if the sixes not postponed are equal to one fifth of all the sixes, then they will be entitled to one fifth of the fund for division until paid, and the sevens *en bloc* will take the four fifths till paid. It is adjudged therefore that in all cases where six per cent bonds are postponed the seven per cent bonds which are duly proved shall take their rank and place, and take a ratable share of the fund to be divided with the sixes which have been allowed.

6. All the seven per cent bonds which were issued under the mortgage to Williams, Aiken, and Robb have been duly proved by the executor of Cutting and by others, to the amount of $499,500, one bond of $500 short of the whole, and they, with the interest thereon, are entitled to take a ratable share of the proceeds of the sale with those six per cent bonds and coupons which have not accepted the act of 1869 to the extent of the amount set forth in the Statutory Lien of 1856; and if there be any surplus, then they would be entitled to claim that surplus to the extent of their debt.

7. The claim of Charles T. Mitchell and the several banks which advanced the money to construct the Bee's Ferry Extension and bridge. This claim has been established by the decree of Judge Pressley at $42,941.14-100, with interest from Oct. 1st, 1877. The evidence submitted together, with the report of the master, satisfies the court that the amount of the sale has been increased fully to that extent by this work.

The work was done by the consent of all parties except one, and as to that one he cannot claim a benefit from that to which

he objected ; and as to him the cost of the construction would have to be reserved from the sale, so that in any event substantial justice will be best reached by paying from the proceeds of the sale prior to all other payments the cost of construction to those who have furnished the means. And the court is bound by every principle of justice to protect its own officer who simply obeyed its mandate, and from whom he took the protection which he held under the lien created when it ordered the sale of the whole road. It is also proper that in the litigation which ensued the receiver should in like manner be allowed his fees of counsel and the cost to which he has been put.

It is therefore ordered that the sum above reported, to wit, $42,941.14-100, with interest from Oct. 1st, 1877, be paid from the proceeds of sale to the South Carolina Loan and Trust Company, The First National Bank, and the People's National Bank, ratably and in proportion to the debts which they hold of the receiver under the lien, any surplus to be paid said receiver, C. T. Mitchell. As to the cost and expenses incurred by the receiver in defending this order of the court he ought to be fully protected, and these should therefore be paid together with the debt from the proceeds of the sale in preference to other claims.

It is therefore ordered that the master, Mr. Clancy, to whom this part of the case had been referred, do ascertain and report the cost and a reasonable fee for the receiver's counsel on this branch of the litigation, and that the same be paid with the debt from the proceeds of sale in like manner.

8. The referee has given preference to the coupons which he has allowed over the principal of the bonds, in accordance with a case from Blatchford's *Reports* which he cites. But the case of the Spartanburg and Union Railroad Company in 8 *S. C.*, 129, has established a different rule, and there is no difference to be taken between the lien of the coupons and the bonds themselves. The exceptions taken to this part of the referee's report are therefore sustained and the report overruled.

9. Exceptions have been taken by McCrady and Son, which raised a question as to the rank of the bonds taken under the

act of 1869, for the coupons on six per cent bonds which were funded under that act. These bonds expressly recognize the priority of the seven per cents held by Cutting and others and therefore must take rank after them.

But, in relation to the six per cent bonds, it seems to the court that they should be reinstated to the rank which they would have held if these coupons had not been funded. When the court holds that the act of 1869 cannot be carried into effect as to these coupons, they should be restored to the holders, and these holders should be allowed to claim as for six per cent coupons under the Statutory Lien, which have been postponed to the sevens by their acquiescence in the act of 1869.

It is therefore ordered that these bonds be admitted to the same rank as the coupons on the sixes, which are to come in after the Cutting sevens.

10. The next subject to be considered is the claim of the state for taxes. It seems to the court that this point has already been decided. The original charter exempted the company from taxes. The act of 1869 made a new contract with the company, by which, in consideration of certain benefits granted by the state, the company agreed to waive its exemption.

The Supreme Court set aside the act which granted the consideration of the waiver, and the referee decided that the waiver fell with it, and held that the company was exempt from taxes. The Circuit Court sustained this report, and upon appeal the Supreme Court affirmed the decree of the Circuit Court. This seems to the court a complete adjudication of the question, and the exception taken to this portion of the report is overruled.

11. Mr. Pringle, by his former report of July 5, 1877, reported that the Hon. Thos. J. Robertson had proved 690 coupons, amounting to the sum of $10,350. This report was confirmed, and Mr. Robertson had judgment for the same on Circuit and on Appeal.

In his recent report, the referee finds that Mr. Robertson funded other six per cent coupons under the act of 1869, and thereby accepted that act. This report was filed in Novem-

ber, 1880. It does not appear that any exceptions were taken in this behalf, but afterwards, it does not appear when, Mrs. Robertson, the wife of Thos. J. Robertson, filed her petition, alleging that the coupons proved in the name of her husband were hers, and not her husband's.

On the 21st of February, 1881, an order of reference was taken to inquire into and report upon the facts stated in the petition, thus practically opening the judgment in favor of Thos. J. Robertson on these coupons. In signing the order I supposed there had been proper notice of the motion served, and that there was no objection.

Afterwards, Mr. Campbell excepted in open court that there had not been proper notice of the motion, and in fact he did not know when it was to be made, and also upon the merits, that the case stated was not sufficient to entitle the petitioner to the relief prayed for. The petition and notice appended are printed and both are without date. The attorneys for the petitioner say they "will move thereon before the presiding judge at the next sitting of the court in this county," as soon as counsel can be heard for an order " of reference to Hon. W. A. Pringle, referee," to take testimony upon the matter set forth in the petition. No other notice appears to have been given of the motion. This notice is clearly too indefinite and insufficient.

The order is set aside for want of due notice, without reference to and without prejudice to the merits of the petitioner's case.

12. During the sitting of the court, sundry holders of six per cent bonds, namely, John M. Guerard, J. L. Lamar, and others, in behalf of themselves and all others claiming a like interest, brought their petition verified by their attorney, whereby they seek to have so much of Mr. Pringle's report of July, 1877, as relates to the coupons of the six per cent bonds of the Charleston and Savannah Railroad Co., guaranteed by the state, produced and proved before Judge Pringle in the names of James Adger & Co., Geo. N. Miller, and Alexander Isaacs, recommitted to the referee, and that he inquire and report whether the said coupons have, by reason of payment or from any other

cause, lost the rank to which they would otherwise be entitled under the principles of his report, with leave to him to report any special matter. Everything stated as ground for asking this order appears. in Mr. Pringle's report of July, 1877, and in the schedule appended thereto.

There is no alleged discovery of any fact which will not appear upon an examination of that report stimulated by ordinary care and vigilance. These coupons are especially brought to view in the body of his report, besides being set forth in detail in the schedule appended thereto.

Judge Pringle reports them as duly proved, and recommends their payment on the same footing as the bonds from which they were detached. No exceptions were taken to his findings and recommendations in this report, and they were confirmed by the Circuit Court. No appeal was taken as to these coupons, and the judgment of the Circuit Court was affirmed by the Supreme Court.

The purpose of this petition is to open this judgment of four years' standing, and upon the ground that it had been recently discovered that said coupons had been paid. It was not denied, but seemed to be admitted, that the bondholders who are now alleging a recent discovery did several years since receive payment for these coupons. There could not, therefore, be any recent discovery of that fact. The question which might have been made at the proper time was, whether the present holders of these coupons, having advanced their money and paid for them, were entitled as purchasers to stand in the place of the bondholders who got their money, and to claim re-payment of what they got for them. Fraud is not alleged. The opinion of the court is, that the petitioners, having neglected to raise the question, are now too late. It is *res adjudicata*, and there is no sufficient reason for opening the judgment heretofore rendered, even if it were within the jurisdiction of this court to do so.

The motion is refused and the petition dismissed.

T. J. MACKEY,

June 17th, 1881.                                    *Presiding Judge.*

SUPPLEMENTAL DECREE.

On delivering the original manuscript of my decree herein to my clerk, to be copied for signature, I inadvertently omitted the loose sheet, containing so much of my decision as relates to the claims due material men. I now transcribe the sheet thus omitted, and embody, in this form, my decision in reference to the said claims, directing that the clerk of the court shall securely attach it to the decree as filed, that it may be deemed and taken as a necessary part of the same.

The report of the referee upon the claims, "properly vouched and audited," due by the receiver to the material men, is hereby confirmed.

In deciding a similar claim, the Supreme Court of the United States said (*Myer* v. *Car Co.*, 102 *U. S.* 13): "In other words, it is, in effect, admitted, that the use of the cars was worth, to the court, while operating the road under the trust created by the appointment of a receiver at the instance of these appellants, just what has been decreed. There can be no doubt that it is the duty of a court to pay, from the trust fund it has in its possession, all the debts it incurred in its judicial capacity while administering the trust assumed pending the litigation in behalf of the litigating parties. . . . It is sufficient for our purpose, on this appeal, that an authorized officer of the court has, in a legitimate way, charged the fund in hand with the debt, the payment of which has been ordered."

Recognizing this decision of the highest judicial tribunal of the country as the settled law of the case, I hold, that these most meritorious claims must be paid; and that they are entitled to precedence over the bond debts, in the order of payment.

It is, accordingly, ordered, that the master, from any funds in his hands, shall pay the said claims of material men, with interest, to the solicitor of the petitioners.

The amounts due to employees, on the pay-rolls, have already been adjudged by me, and paid, and are, therefore, not embraced in this decretal order. The claim of Daniel Green was not argued before, and hence I have not decided it.

The six per cent bond, No. 257, with coupons, from March 1, 1867, belonging to the estate of W. P. Ingraham, should rank with the six per cent bonds which have not accepted the act of 1869. And it is now so ordered, to remedy the accidental omission.

T. J. MACKEY,
*Presiding Judge.*

June 24, 1881.

To this decree, numerous exceptions were filed, but the precise points raised are clearly stated in the opinion.

The case was very fully and elaborately argued in this court by Messrs. *Buist & Buist, Brawley & Barnwell, Thos. M. Hanckel, Lord & Inglesby, C. R. Miles, Mitchell & Smith, Hayne & Ficken, A. T. Smythe, John Wingate* and *James Conner*, for holders of six *per cent* bonds and coupons; by Messrs. *Youmans*, attorney-general, and *DeSaussure & Son*, for the state and for the county treasurers; by Mr. *J. B. Cambell*, for the railroad company, and seven per cent bondholders; by Messrs. *Memminger & Son*, for Cuttings, executors and Mitchell; by Messrs. *McCrady & Son*, and *A. G. Magrath*, for seven *per cent* bondholders; by Mr. *H. E. Young*, for the receiver, claims against the receiver, and for Isaacs; by Mr. *F. D. J. Lawrence*, for Daniel Green.

August 9th, 1882. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. The "Charleston and Savannah Railroad Company" was incorporated in 1853, to build a railroad from Charleston to Savannah.

In December, 1856, the legislature of South Carolina passed an act, entitled "An act to aid in the construction of the Charleston and Savannah Railroad." (12 Stat. 543.) This act provided for the endorsement of the guarantee of the state upon the *six per cent* bonds of the said company to be issued, not to exceed $5000 per mile; said bonds not to be used for any other purpose than "procuring the iron rails, chairs, spikes, and equipments, and for putting down the rails," etc., and then declared: "When the whole of said road shall be completed,

the state of South Carolina shall be invested *with a lien*, without a deed from the company, upon the entire road, including the stock, right of way, etc., . . . and the whole superstructure and equipments, and all the property owned by the company, as incident to or necessary for its business, for the payment of all of said bonds endorsed as aforesaid, as provided in this act, and for the interest accruing on said bonds," etc. And the act further declared that " the said lien or mortgage of the state shall have priority over all other claims existing, or to exist, against said company," etc. Under the provisions of this act the *six per cent bonds* of the company, payable March 1, 1877, were endorsed by the state of South Carolina to the amount of $505,000, and issued by the company.

On January 1, 1858, before the road was finished, the company needed more money, and conveyed to I. W. Hayne, Edward Sebring, and E. M. Beach, as trustees, all its then present and after to be acquired property, and all franchises, rights and privileges of the said company of, in, or concerning the same, in order to secure the payment of bonds to the amount of one hundred thousand dollars, a large part of which was issued. The road was completed and opened at the close of the year 1860.

The property was greatly damaged during the war. The referee reports that the company was reduced to insolvency; the road was broken up, the bridges destroyed, great part of the iron carried off, and the road as a whole no longer fit for use. Under these circumstances, the trustees under the deed of January, 1858, by virtue of the powers therein contained, proceeded to foreclose, and in December, 1866, the mortgaged premises were sold subject to the lien created by the act of 1856. At this sale the property was purchased by Geo. W. Williams and others associated with him, for the sum of $30,000, and in December, 1866, *another act* was passed incorporating the purchasers as a new company under the name and style of the " Savannah and Charleston Railroad Company," and thereafter the company has been known throughout these long legal proceedings by that name. The court confirmed the sale, and the new company was duly organ-

ized, took possession of the road, and endeavored to reconstruct the same.

They had no other means of repairing the road but by a loan ; but that they were unable to effect as long·as the lien created by the act of 1856 in favor of the state was the first lien, and, therefore, in 1869 they memorialized the legislature upon the subject, and on March 2, 1869, an act was passed, entitled, "An act to enable the Savannah and Charleston Railroad Company to complete their road," by which the company was authorized to issue other bonds to the amount of $500,000, bearing interest *at seven per cent*, the proceeds to be used in the extension, building, and outfit of the road. As they are frequently referred to in this opinion, the third, sixth, and seventh sections of this act are as follows :

SEC. 3. "That the said company ·is hereby authorized and required to fund and redeem the coupons for interest of the bonds of the Charleston and Savannah Railroad Company guaranteed by the state, now past due, and that may fall due on or before the first day . of September, 1869, by issuing therefor an equal amount of their bonds with coupons attached for interest, payable semi-annually, at the rate of *seven per cent per annum*, and· the principal to become due in twenty years after the date thereof. And the payment of the said bonds so to be issued in substitution for interest coupons shall be guaranteed by the state in the same manner and as fully as the said original bonds of the Charleston and Savannah Railroad Company are now guaranteed : subject, however, to the provisions of section six of this act."

SEC. 6. "That the present lien of the state of South Carolina on said railroad shall, upon the issue of the bonds provided for in and by the first section of this act, *be postponed and become a second lien*, which said second lien shall extend over and cover the whole road, its outfit and real estate, as fully as is already provided for by law. The said road shall be completed by the first day of January, 1870."

SEC. 7. "This act shall not be of force until said Savannah and Charleston Railroad Company consent to the amendment of their charter, so that the property of said corporation shall

be subject to taxation, in conformity with Section 2 of Article XII of the constitution, and said consent be certified under the seal of said company to the comptroller-general and secretary of state. Upon the filing of said consent, the said charter shall be deemed and held to be modified in conformity with said section of the constitution: *Provided*, That no tax shall be assessed or levied upon said road until the same shall have been completed."

The company in form accepted this act, and in accordance with it issued bonds to the amount of $500,000, bearing interest at *seven per cent per annum*, covered by a mortgage to Wm. Aiken, James Robb, and Geo. W. Williams, as trustees, which represented that the state having postponed the statutory lien, it was the *first lien* upon all of the property of the company. The bonds were negotiated with the contractors who rebuilt the road, and for other purposes connected with running the same.

In 1871 the stockholders of the company authorized another issue of bonds to the amount of $300,000, at the rate of *eight per cent per annum*, which were covered by another mortgage of the property of the company, *its rights, privileges and franchises*, in this state and Georgia, executed to Andrew Simonds, H. H. DeLeon, and E. Bates, as trustees.

Much controversy has arisen under these acts and mortgages as to the rights of the different classes of creditors of the company, but it is believed that for the purpose of making intelligible the issues now involved it will not be necessary to do more than make the following brief statement:

On April 12, 1870, Daniel Hand filed his complaint of foreclosure against the Savannah and Charleston Railroad Company, D. H. Chamberlain, attorney-general of the state, and others, to enforce payment of the amount alleged to be due him *on unfunded coupons* issued under the act of 1856, to wit: Principal, $27,705, together with interest on the same. Soon after the attorney-general instituted proceedings to foreclose the statutory lien of the state, praying, among other things, that the creditors might be called in, for the appointment of a receiver, the sale of the property, etc. These cases,

considered together, were argued twice before the Circuit Court, and, on appeal to this court, were dismissed, without prejudice, and the cause sent back, that the Circuit Court might decide the character of the relief to which the parties were entitled. 5 *S. C.* 183.

On April 28, 1874, after the case went back to the Circuit, Judge Graham, seemingly by the consent of all parties, made a decree appointing *Charles T. Mitchell, Esq.,* receiver of the road, who, in connection with an advisory board, was to work and manage the said railroad " with the greatest possible skill and economy, and the results be reported quarterly to the court in this cause, and the net profits, after paying all necessary expenses, including such amounts, if any, as may be due the employees and officers for services, shall be applied quarterly to the payments of the debts." The order in which the debts were to be paid by the receiver was declared in the decree, and all suits against the company were enjoined, etc. Soon after, Judge Reed enlarged the powers of the receiver so as to allow him to sell the road for the sum of $1,500,000, which, as stated, had been or would be offered for the same. About this time Solomon L. Hoge instituted proceedings to take possession of the road as *comptroller-general,* under the *fifth* section of the act of 1869, but this effort seems to have failed, and needs no further notice here. See *Ex parte Dunn, in re Hand* v. *Savannah and Charleston Railroad Company,* 8 *S. C.* 208.

In 1875, William Cutting and Heyward Cutting, executors of Francis H. Cutting, deceased, who held a large number of the *seven per cent* bonds issued under the act of 1869, made themselves parties in the cases, stating, among other things, that the income of the road under the management of the receiver and advisory board had proved insufficient to pay any of the debts set forth in the decree making the appointment, and praying a sale of the road, and that the bonds of 1869, and the state indorsed bonds of 1856, should be placed upon the same footing and the guarantee of the state entirely discharged, and accordingly on May 1, 1875, a consent decree was entered ordering the sale of the road on a credit, and discharging the

state from liability on its indorsement; yet it seems for some reason or other the sale and further proceedings under the decree were suspended by an order of Chief Justice Moses in the case of *Ex parte Dunn* above stated.

On April 19, 1877, Judge Reed made an order appointing William Alston Pringle, Esq., special referee, to report the rank of the different claims and in the order in which they should be paid upon the foreclosure and sale of the property, and on July 5, 1877, the said referee made a full and exhaustive report, both on the main question as to the priorities of the bondholders and all the collateral questions arising in the case. He held that the lien of 1856 attached to the bonds issued under it and retained its priority, and that the state could not postpone that lien to the bonds and mortgage of 1869.

He further held that the holders of the coupons belonging to the bonds issued under the act of 1856, who received in exchange for their coupons the bonds issued under the third section of the act of 1869, thereby *accepted the provisions of the act of* 1869 *and consented to the postponement of the lien of the act of* 1856, so far as the coupons funded were concerned. " The bonds, therefore, issued under the third section of the act of 1869 have no lien on the property of the company, and will take rank after other obligations of the company which have a lien on its property," etc.

The referee, therefore, after providing for certain liens on particular property, reported the priorities of the bonds to be as follows: *First.* The bonds and coupons still unfunded issued under the *act of* 1856 to be the first lien upon all the property of the company. *Second.* The bonds and coupons issued under the mortgage of 1869 to be a second lien upon all the property of the company. *Third.* The bonds and coupons issued under the mortgage of 1871 to be the first lien on all the *corporate franchises* of the company and the third lien upon all its property. *Fourth.* The judgment held by W. C. Bee, assignee, being the next lien after the foregoing on all the property of the company. *Fifth.* The *seven per cent* interest funded bonds having no lien on the property of the company, etc.

To this report exceptions were filed, and the case came on to be heard before Judge Wallace, who, in so far as it related to the priorities of the different classes of bonds, confirmed the report, and ordered it to stand as the judgment of the court, and ordered the property sold by one of the Masters of the court. Exceptions were filed, and upon appeal to this court the case was heard here at the April Term, 1870. See 12 *S. C.* 314. In regard to the main question as to the right of the state to postpone the lien of the bonds issued under the act of 1856 to those issued under the act of 1869, this court concurred with the judgment of the Circuit Court. It also concurred with the referee and Circuit judge that the holders of the coupons belonging to bonds issued under the act of 1856, who received in exchange for the coupons the bonds issued under the third section of the act of 1869, accepted the provisions of the act of 1869, and consented, so far as the coupons were concerned, to the postponement of the lien of the act of 1856. But this court went further and held as follows:

"The referee, and the court sustaining his conclusions, held that the effect of the act of 1869 on those funding coupons thereunder was confined to the coupons so funded, and did not preclude parties having funded coupons from afterwards asserting their original rights as it regards the bond and other coupons not funded. The correctness of this conclusion will next be considered. The exact question is whether one having a bond of the class of 1856, and also coupons of the same class, whether detached or otherwise, and funding such of said coupons as were matured, under the third section of the act of 1869, can be regarded as having accepted the provisions of that act as well as it regards such bonds and immature coupons as the coupons that are matured and actually funded. The bonds and their coupons constitute a single obligation. *State* v. *Railroad Company*, 8 *S. C.* 153. The coupon merely evidences the obligation collaterally, as it regards one of its incidents. The act of 1869 operates upon the entire obligation, both principal and interest. One who accepts its provisions for one purpose, necessarily accepts it for all pur-

poses, for its provisions are not capable of severance. When one claiming upon an obligation for principal and interest accepts interest upon a composition in terms assuming to affect the conditions upon which the same is due, he must be regarded as accepting the terms of composition in their whole scope. This conclusion is so obvious that it does not require authority or illustration. It depends upon the principle that when the contract is one and indivisible, if it takes effect at all it must do so as to all its parts. This does not preclude the possibility of severing the terms and conditions of a contract, but that depends upon mutuality of consent, while in the present case there is no evidence that the state has assented that the act of 1869 may take effect otherwise than according to its entire scope and purpose. It would follow that one funding coupons under that act must be regarded as bound by its terms, *as it regards any bonds or coupons held by him at the time of funding of the same class, at least, with the coupons funded. The case before us does not enable us to apply this principle to the facts of the case;* we can, therefore, only set aside the conclusion of the Circuit Court to the extent that it conflicts with the conclusions just stated, and the exact application of the principles laid down must be made upon a further hearing in which such evidence may be introduced on that point as the nature of the case demands." 12 *S. C.* 350.

Accordingly the case went back, and Judge Aldrich made another order for the sale of the property, which was affirmed on appeal. See 13 *S. C.* 467. The sale was made by Mr. Porter, one of the masters, for the sum of $300,200, less than either class of the bondholders seeking payment, and was confirmed by the court, and title made to the purchasers.

The order of Judge Aldrich also directed Mr. Pringle, the referee, to inquire and report as follows: 1. "What claims and demands against the Savannah and Charleston Railroad Company are undisputed and entitled to immediate payment. 2. What bonds and coupons of said company issued under the act of 1856 are entitled to priority of payment out of the property of said company, under the principles settled by the

judgment of the Supreme Court. 3. The amount of bonds issued under the act of March, 1869. 4. The amount of bonds and coupons issued under the Act of 1856, and entitled to priority of payment. 5. The bonds and coupons issued under act of 1869, indorsed by the guarantee of the state. 6. What coupons of bonds, issued under the act of 1856, have been funded under the third section of the act of 1869, the number and value of said coupons, by whom, when, and under what circumstances funded, etc."

The referee took testimony and made another report upon the point recommitted to him. He construed the opinion of the Supreme Court to mean that only the bondholders, personally, who funded coupons from bonds of 1856 must be regarded as bound by the terms of the act of 1869, so far as regards bonds and coupons held by them *at the time of funding,* and that those who presented six per cent bonds, and were not found to have funded coupons, could not be presumed to have accepted the act of 1869. Considering the evidence offered with reference to this principle, he found that certain persons presenting bonds of 1856 were estopped, for the reason that it appeared from the books of the company that coupons had been funded *in their names.* From the identity of the names he felt authorized, nothing appearing to the contrary, to conclude that the same parties presenting the bonds *had owned them at the time of funding the coupons.* He furnished a list of the bondholders falling under this category, showing their names, and their bonds amounting in the aggregate to $65,500. But as to all the other bonds and unfunded coupons issued under the act of 1856, he held that the proof necessary to bring them under the principle of estoppel had not been furnished, and that they are entitled to retain their prior statutory lien, notwithstanding the act of 1869.

To this report exceptions were filed, and the case came on to be heard by Judge Mackey, who, upon the main point as to the sufficiency of proof to estop the holders of the six per cent bonds, reversed the report of the referee, and after excepting the coupons of Daniel Hand as *res adjudicata,* and the bonds held by Beaty, as executor of Mrs. Nancy

Blair, and those proved by Bradley Martin, decreed as follows: [The opinion here quotes nearly all of the sections numbered 4 and 5 of the Circuit Decree on pages 230–232 ante.]

Exceptions by the various parties and in different forms have been filed to this decree, and the question is, whether it is erroneous, and if so, wherein?

We cannot follow the exceptions *seriatim*, but will endeavor to consider all the points as they arise.

Most of the complications of the case originate in the fact that while the act of 1869 was unconstitutional and void so far as it undertook to postpone the lien of 1856, yet it has been held to be valid *in part;* that is to say, bad in the general, but binding as to certain persons and for particular purposes. The rights of the parties might have been easily determined if the act of 1869 had been legal and binding in all its parts, or if, on the other hand, it could be considered as wholly void and expunged from the statute book. But when the provision aforesaid, void in the general, has been held to take effect as to certain persons, not from its intrinsic authority as an act of the legislature, but from the conduct of the parties in accepting the benefit of some of its provisions, there necessarily springs up a new class of questions such as these, viz., who have done these alleged acts of acceptance and as to the proper effect and extent of such acts as to other persons and claims not involved is the acts themselves? In this state of the case the difficult duty is devolved upon the court of determining these vexed questions without the least assistance from, but really in seeming conflict with some of the express provisions of the act of the legislature in connection with which they arise.

The most important question in the case is that as to the priorities of the bondholders under the acts of 1856 and 1869. This court in its former judgment determined the rights of the parties. It decided that the state could not postpone the lien of the act of 1856, and that the act of 1869, purporting to do so, was unconstitutional and void; but it held at the same time that to this general conclusion there was an exception so far as concerned those who had funded coupons taken from bonds

issued under the act of 1856 then owned by them, and taken in exchange bonds issued under the act of 1869. As to these it was held that they had accepted the act of 1869 *quoad* these coupons so funded; and further, that on the principle of estoppel "*one funding coupons under that act must be regarded as bound by its terms as it regards any bonds or coupons of the same class held by him at the time of funding.*" In order that the principle here laid down might be intelligibly applied, it was necessary to send the case back; and it was remanded in order to have it ascertained whether any of those who funded coupons held other bonds or coupons of the same class "*at the time of funding,*" and if so, what bonds or coupons were so held, and by whom. As we understand it, this was simply a question of fact, and being a question of evidence must be determined precisely as other questions of that kind are determined; and it will probably assist us in reaching a satisfactory conclusion to keep constantly in view the simple character of the issue.

The doctrine declared by this court as to the effect of funding coupons, upon the holders of six per cent bonds, does not proceed upon any supposed relation between the coupons funded and the bonds from which they were taken, but is of that class of estoppel which arises from the "*conduct of parties.*" As it springs only from the act of the party it is purely personal, and in its effect cannot reach beyond the bonds or coupons actually held at the time by the party funding. It is true the estoppel springs from the funding of the coupon; that is to say, not from the coupon itself, but from *the act of funding it;* upon the principle that an admission of one as to a part of his property, may be held to affect *all his other property* of the same character. We think it is a misapprehension to suppose that the estoppel either arises from or rests upon a principle in the nature of a proceeding *in rem*, inhering in *the coupon* and thereby affecting the bond from which it was cut without regard to who was at the time the owner of the bond. The *ownership at the time of funding* is the indispensable prerequisite to the existence of the liability; and the fact that the coupon and bond were originally parts of the same paper can

have no effect whatever upon the question of estoppel, except in so far as it may be considered as a circumstance of proof upon the question of ownership at the time of funding, in which view it will be considered hereafter.

*Was the proof sufficient to show that any of those now presenting bonds or coupons of* 1856 *had funded coupons of that class in bonds of* 1869, *being at the time of funding the holders of the bonds now presented, and, if so, as to what bondholders and as to what bonds or coupons was such proof made?*

In this issue the *onus* was on those who alleged the existence of facts necessary to create the estoppel. The court had settled the law that the lien under the act of 1856 was not postponed, but that practically there might be an exception to be determined by the existence or non-existence of certain facts. When a party proved that he held bonds of the issue of 1856, he was entitled to priority, unless it could be made to appear that he fell within the exception, and it was incumbent on those who affirmed that he did to prove the fact. This is elementary. "A third rule which governs in the production of evidence is that the obligation of proving any fact lies upon the party who substantially asserts the affirmative of the issue. This is a rule of convenience, adopted not because it is impossible to prove a negative, but because the negative does not admit of the direct and simple proof of which the affirmative is capable. It is therefore generally deemed sufficient, when the allegation is affirmative, to oppose it with a bare denial till it is established by evidence. Such is the rule of the Roman law. '*Ei incumbit probatio qui dicit, non qui negat.*'" 1 *Greenl. Evid.* § 74.

Accordingly the *six per cents*, with the exception of three or four individuals, offered no proof, but stood upon the former judgment of this court that the act of 1869 did not postpone them. The *seven per cents* undertook to make out against them the case of estoppel authorized by the judgment, and for that purpose introduced testimony, including the books of the company, to show who had funded coupons in 1869. The books were objected to as incompetent against the sixes. The entries were made in the handwriting of S. W. Fisher, treasu-

rer of the company at the date of the entries, who is now dead. The referee admitted the books "as coming within the rule laid down by Mr. Wharton (*On Evidence*, § 238), as memoranda or book entries of an officer, agent, or business man when in the discharge of his duties, after his decease." We cannot turn aside now to go fully into the matter, but only say that under the circumstances of the case we think the referee did right in admitting the evidence, on the ground that it was the best proof the nature of the subject admitted of, and from the necessity of the case.

As to the sufficiency of the proof made, the referee and the Circuit judge took very different views, arising principally from the force of presumptions accorded by the judge to the simple possession of the coupons funded. We think it appears that the company is in possession of coupons from all the six per cent bonds, except perhaps twelve held by Mrs. Blair's estate. It was claimed on one side, and as strongly denied on the other, that *all* these coupons had been *funded* and *none* were taken up by payment. The evidence on the subject was somewhat confused. Mr. Fisher, who superintended the funding and made the entries, is dead, and the other witnesses for the most part could speak only from the books. It was much easier to issue other bonds than to pay the cash, and it is reasonably certain that a large majority of coupons now in possession of the company were *funded*—certainly to the amount in the aggregate of $172,800, but it is not quite clear that the company funded coupons from *all the bonds*, and to the extent of that uncertainty it would be difficult to say when any particular bond was presented, whether it was one of those from which *funded* coupons had been taken. But this is not very important. If we assume that the company has funded coupons of all the bonds, with exceptions as stated, how does the matter stand?

I. We have the names of those who now present six per cents, and the books give us the names of those who funded coupons from sixes, and we find that in a large majority of cases the bonds are now presented by persons whose names do not appear in the funding. As a rule those who funded and

those who now present bonds are different persons. There are, however, some cases in which the bonds are now presented in the name or at least in the right of those who appear to have funded coupons. As to this class the referee, as we understand him, having received no explanation from the parties after opportunity given to them, held it sufficiently proved that those now presenting bonds were the holders thereof at the time they funded the coupons, and in consequence that as to these bonds they are estopped by the act of 1869.

In opposition to this view it is urged that none of these bonds are certainly shown to be the identical bonds from which their coupons were funded, and that after such a lapse of time it may be that the bonds now presented were purchased after the coupons were funded. This may be possible, but considering how easy it would have been for the parties to make such explanation if they could have done so, we concur with the referee in his conclusion, that as to this class of bondholders it was proved that they were the holders of these bonds "at the time of funding." The principal witness being dead, it was from the nature of the subject difficult to make proof of the fact of ownership at the time of funding, and as a circumstance, the coincidence of the names of those who funded and those who present the bonds is so strong that unexplained it affords reasonable proof of the ownership of the bonds at the time of funding, although that occurred as long ago as the year 1869. The referee gives a list of those whom he places in this class, with some explanation, in his second report, which upon this point is affirmed and made the judgment of the court.

II. As to all the remaining bonds and unfunded coupons issued under the act of 1856, which are now presented by parties *other* than those who had to do with funding coupons, the question is more difficult. As to these the referee held that "the non-appearance of the name of the present holder in the books of the company is presumptive, if not conclusive, that the present holder of the bond was not the holder at the time of the funding, or that the coupons were sold and not personally funded by him. The bonds being negotiable secu-

rities are not affected by any transactions of which the present holder has had no notice, and the present possession of such a bond is *at least prima-facie* evidence that such possession is *bona fide*, and without notice of any equities affecting it," whilst the Circuit judge took a different view, and held, as previously stated, that all the sixes, no matter by whom proved, are estopped by force of the presumption that the possession of the coupon is *prima-facie evidence* that the holders owned the bond from which it was taken at the time of funding.

It thus appears that the whole question is made to depend on a presumption which is claimed to arise out of what is called the "juridical relation" of a coupon to the bond from which it was originally taken. It is certainly true that the parties who funded coupons had possession of them at that time, and it is claimed that possession of the coupon is *prima-facie* evidence that the holder was at the time the owner of the bond from which it was taken. As we understand it, this is only another mode of expressing the proposition that the original unity of the bond and its coupons creates a presumption that such relation continues until the contrary is shown. If we are correct in this, the presumption claimed is clearly not one of those presumptions of law which are conclusive, but of fact, "which are, in truth, but mere arguments, of which the major premise is not a rule of law, and ought to be judged by the common and usual tests of the truth of propositions, and the validity of arguments." *Greenl. Evid.*, § 44. Thus considered by the usual tests of truth, can it be said that the possessor of a coupon is, as a matter of fact, so certainly and universally the owner of the bond from which it was taken that it may be affirmed, as a rule of evidence, that the possession of one at any particular time subsequent to its issue proves the ownership of the other at that time?

It is true that the bond and its coupons were originally parts of the same paper; but, in regard to the idea of "continuity," it should be borne in mind that from the first the bond and coupons were not *intended* to remain, and that there is nothing in the character of their connection which *requires* that they should remain one and indivisible. On the contrary, the

coupon, as its name indicates, was made for the purpose of being *cut off*, and it is well settled in law that such separation makes the bond and coupons distinct evidences of debt; and it is as well settled in fact that from the convenience or necessities of parties it is matter of every-day practice to separate them. As, for example, the action in this case was founded exclusively on coupons held by Daniel Hand, who, as far as it appears, never owned a bond of the company, but received his coupons in the course of business, without the least reference to the bonds from which they had been cut. In the case of *Hartman* v. *Greenhow*, 12 *Otto*, 684, the United States Supreme Court say: " The coupons, when severed from the bonds, are negotiable, and pass by mere delivery. They then cease to be incidents of the bond, and become in fact independent claims. They do not lose their validity if, for any cause, the bonds are cancelled or paid before maturity. . . . Here, also, the coupons held by the petitioner are distinct contracts, imposing separate obligations on the state. He was not the owner of the bonds to which they were originally attached. In his hands they were as free from all liability on the bonds as though they had never been connected with them." In *Ketchum* v. *Duncan*, 96 *U. S.* 659, Mr. Justice Strong says: " Interest coupons are instruments of peculiar character. Title to them passes from hand to hand by mere delivery. A transfer of possession is presumably a transfer of title."

We cannot, therefore, certainly say that any particular bond now presented is the identical bond from which coupons were funded; or, if so, that such funding was done *while the person now presenting the bond was the holder of said bond*. We cannot regard the mere possession of the coupon funded as affording satisfactory proof of the ownership of the bond at that time. This would be giving to the original unity of the bonds and coupons a *continuing* force and effect inconsistent, it seems to us, with the usual course of business as to such papers, and most probably, at least in some instances, at variance with the truth. The evidence does not come near enough or show the necessary fact with sufficient certainty and distinctness. Proof of facts which are to create an estoppel

should be full and clear. "*Certainty* is essential in all estoppels. The courts will not easily suffer a man to be deprived of his property or security when he had no intention to part with it." *Big. on Est.* 441.

"When the burden of proof lies upon the plaintiff there must be something more than probability or even strong probability. . . . It seems to me that it would be very unsafe to say that because there is a strong probability of the existence of a state of things from which a prior authority, or subsequent ratification, might be inferred, a jury would be warranted in acting upon it as if there were strict legal proof." *Fitzgerald* v. *Dressler*, 97 *Eng. Com. L. Rep.*, 395. The case of *McCoy* v. *Washington County*, 3 *Wall., Jun.*, 381, and *Moran* v. *County Com'rs*, 6 *Ohio St.* 287, cited and relied on as announcing a different doctrine, are not analogous to this case. If these cases are examined carefully, not with reference to the doctrine and dicta of the opinions, but to the *essential facts* and the *points decided*, it will be found that neither of them holds anything inconsistent with the views here presented.

The inherent insufficiency of the proof to estop the bondholders of the class now under consideration will be more manifest when reference is made to the nature and character of the bonds as negotiable instruments. These bonds, although issued as long ago as 1856, were not due and payable until March, 1877. They were not dishonored, and passed from hand to hand by mere delivery. Whatever presumption as to the ownership of the bond at the time of funding may have arisen *from the possession of the coupon* at that time, is, at least, counterbalanced by that other presumption which arises *from the possession of the bond* itself.

"Bonds with coupons payable to bearer are negotiable securities and pass by delivery, and, in fact, have all the incidents of commercial paper. It is not necessary that the holder of coupons in order to recover on them should own the bonds from which they are detached. The coupons are drawn so that they may be separated from the bonds, and, like the bonds, are negotiable, and the owner of them can sue without the possession of the bonds to which they were originally

attached, or without *being interested in them.*" *Thomson* v. *Lee County*, 3 *Wall.*, 331, and the authorities there cited; *Langston* v. *S. C. R. R. Co.*, 2 *S. C.* 248.

But it is said that the present holders acquired their bonds after the act of 1869, and with knowledge that some of the coupons originally attached had been cut off, which itself was information that they had been *funded by the owner* under the act of 1869, of which they are bound to take notice; therefore, the present holders are in no better condition than those who, it is alleged, funded coupons from them while they were the holders. It will be observed that this doctrine of notice is based entirely on the assumption not only that the missing coupons were *necessarily funded*, but that it was done by the persons then owning the bonds, which we have endeavored to show could not be taken as universally true. Can a party be fairly fixed with notice of a fact proved only by a presumption which itself is at least uncertain?

It does not appear at what time the holders of these bonds acquired title to them, which might have been during the period from 1856 to 1869; but if we assume that it was after the act of 1869, and that that was a public act, of which every citizen was chargeable with notice, yet that act of itself cannot justly be considered as giving notice of anything *outside of its terms.* It did give notice that the company was required to fund the past-due coupons of 1856, but it gave to the public no information as to what coupons had been funded, nor by whom, nor whether those funding owned the bonds "at the time of funding." Whilst notice of the act as it was written was possibly notice of all the consequences which it involved, whether then known or unknown, yet, in considering a question which touches the "*bona fides*," we cannot shut our eyes to the fact that the act did *not* on its face declare what was subsequently developed by the courts, that the postponing provision was void, but contained in itself a latent power of restoration, as to the persons who should, even in ignorance of the true condition of things, accept some of its provisions.

For well-known reasons the doctrine of constructive notice, including the duty of inquiry, is not applied with strictness to

negotiable paper, which by the Law Merchant passes by mere delivery. "Possession, even without explanation, is *prima-facie* evidence that the holder is the proper owner or lawful possessor of the instrument, and the settled rule is that nothing *short of fraud*, not even *gross negligence*, is sufficient to overcome the presumption and invalidate the title of the holder, as inferred from his actual custody of the instrument." *Commissioners of Marion County* v. *Clark*, 94 *U. S.* 278. "The purchaser of negotiable securities before their maturity, whatever may have been their original infirmity, can, unless he is *personally chargeable with fraud in procuring them*, recover against the maker the full amount of them, though he may have paid therefor less than their true value." *Cromwell* v. *County of Sac*, 96 *U. S.* 51; *Witte* v. *Williams*, 8 *S. C.* 290; *McKnight* v. *Gordon*, 13 *Rich. E.* 244. In our own well-considered "*Bond Debt Cases*," 12 *S. C.* 272, Judge McIver, as the organ of the court, after reviewing the authorities, announces the law in these terms: "The holder of commercial paper, in the absence of proof to the contrary, is presumed to have taken it under-due for a valuable consideration, and without notice of any objection to which it was liable."

The referee's report as to the class of bondholders under the act of 1856, now under consideration, is also affirmed.

In the general view taken by the Circuit judge, it was not necessary to consider special cases, and, therefore, they are not regularly before this court. The claims of Lord, as executor of Mrs. Roper, Tiedeman, and Quinby, should be recommitted to the referee to inquire and report in what class they should be placed respectively according to the principles herein indicated.

III. It is insisted that the coupons of the six per cent bonds which matured prior to September, 1869, are entitled to payment in full before distribution of the proceeds of sale among the bondholders, for the reason that all the coupons of the same class were settled, and the priority thus claimed is necessary to establish that equality which is demanded by the principles of equity. In support of this doctrine is cited the case of *Stevens* v. *N. J. and Oswego Midland R. R. Co.*, 13 *Blatch.*, 412.

The referee adopted this view, but the Circuit judge denied the claim, and upon this point we agree with the judge. The holders of these coupons, if they had so desired, could at any time after 1869 have funded their coupons in bonds under that act, and thus placed themselves upon an equal footing with others holding coupons of the same class. They did not do so, and as to the fund now in the hands of the court arising from the sale of the property, being in the nature of equitable assets, they are only entitled to their *pro rata* with the other bonds and coupons of 1856, which are not affected by estoppel. *The State* v. *S. and U. R. R. Co.*, 8 *S. C.* 129, and the authorities there cited.

IV. It is further claimed that inasmuch as some of the *sixes* have by their conduct accepted the act of 1869, and as a consequence taken their place in the postponed class, a corresponding number of the *sevens* should be advanced and allowed to take their places thus vacated in the *first class;* that the waiver of the lien enures to the benefit of those in whose favor it was made; that it must be held to operate *as an assignment* of the interest under the first lien, and that to the extent of the estoppel the parties simply change places. We do not see that the unaffected *sixes* would have any equity to object to such a result. They took their security knowing that it covered the whole class; so far as they are concerned it was a mere accident that some of their associates obeyed the law as it was written, and did that which postponed them. Those who did nothing have no equity to have their security increased in value, as each associate, who might have stood still, as they did, fell by his own act into another and a lower class. They have no right to complain when they get all the rights originally secured to them. If the act of 1869 were legal as a whole, or if it had been accepted by all the sixes, it is clear that by the terms of the act they (the sixes) would have been postponed, and we suppose *the sevens* would have become thereby "*the first lien.*"

But in case of an acceptance *only in part,* can we declare the same result *pro tanto* as to the claims of those who are held to have accepted the act of 1869? We regret to say that we

think that is beyond the power of the court. The act proceeded on the assumption that it was to take effect *as a whole,* and of course it made no provision for the case which has arisen. It has been declared void, and is only revived *quoad* those who have accepted it, and there is still a class of sixes who stand out and insist upon their rights as having "*the first lien.*" We see no authority which would authorize the court to declare any *part of the sevens* entitled to take the place of the *postponed sixes,* and share in that first lien. Estoppel is not declared by the act, but is the result of judicial interpretation. We cannot *amend the law* so as to meet an emergency which was not foreseen or provided for by those who framed it. We can do no more than simply declare the result of the estoppel as to the sixes, who have, by their own act, satisfactorily proved, lost their priority, leaving the sixes who are not estopped entitled exclusively to the first lien, as given to them by the act of 1856. This was in effect held by the former judgment.

V. It is still further contended that the interest funding bonds of 1869, which were taken in exchange for funded coupons of 1856, are entitled to rank as high as the coupons for which they were taken; that the state proposed to put these bonds exactly upon the same footing as the bonds from which they were detached, and that proposition as a whole having failed because of the unconstitutionality of the act, the holders of these bonds should not be bound by any of the provisions of the act, but be remitted to their former condition. If we could administer abstract justice, there might be force in this view. It is undoubtedly true that coupons are of the same grade as the bonds from which they are taken, and it is also true that nothing is payment but that which produces payment, or *is received as payment.* "To give one security for another of equal dignity, without the intention of discharging the debt, is not payment, but *substitution.*" *Gibbes* v. *G. and C. R. R. Company,* 13 *S. C.* 228. The difficulty here, however, is that the parties funding took the bonds as payment under the act of 1869, and gave up their coupons; and there is also a further difficulty that the act of 1869, which they

accepted by receiving bonds under it, provided *no security whatever* for this class of bonds, except the guarantee of the state. This question was also adjudged by the former decision in this case, which declares as follows:

"There was no error in ruling that the bonds issued under the act of 1869, for the redemption of coupons of 1856, were not entitled to any lien on the property of the company. It has already been held that the act of 1869 was, in effect, an assertion on the part of the state of exclusive control over the lien or mortgage created by the act of 1856, and that the holders of bonds and coupons who accepted the benefit of the act of 1869, assented to and are bound by this view of the act of 1856. It would follow that they can claim nothing but what the act of 1869 recognizes by way of security. In that act the state waives its lien under the act of 1856 in behalf of the holders of bonds issued under the first section of that act, which does not cover the redemption bonds. Consequently the position of the redemption bonds is this: The property of the company is liable, as far as the bonded debt is concerned, *in the first instance,* for the payment of the bonds and coupons of 1856, where the rights of the holders have not become subsequently impaired; *secondly,* to the bonds issued under the first section of the act of 1869; *thirdly,* to indemnify the state upon its guarantee on the bonds and coupons of 1856, and on those issued under the act of 1869, which have upon them the indorsement of the guarantee of the state. This would leave the state bound as surety on the redemption bonds, and holding a third lien wholly subject to its control for its protection from liability thereunder."

To pay the liens in the order here indicated the sale of the road was ordered, and the judgment further declared "that as to all that part of the permanent property mortgaged that lies within the state of Georgia, such sale must be made subject to *such liens* as have been or may hereafter be established under the laws of that state." That is to say, subject to such liens by mortgage, execution, or otherwise, as by the laws of that state exist upon the permanent property of the company within the borders of that state.

*The next question is as to the coupons of Alexander Isaacs, G. N. Miller and James Adger & Co.* On February 19, 1877, an order was made referring the issues to Wm. Alston Pringle, Esq., as referee, to take testimony, "ascertain and settle the rank and priorities of the claims proved by the parties to the suit, and all others whose debts are secured by mortgage or other liens upon the property and franchises of the company, and to report the order and rank *in which the respective claims* or classes of claims proved before him were to be paid upon the foreclosure and sale of the property."

The referee took the testimony, and on July 5, 1877, reported that the bonds and coupons of 1856 *proved before him* were stated in "Schedule A" as part of his report, which em‐ braced detached coupons of the years 1870, 1871 and 1872, proved by James Adger & Co. to the amount of $14,580; by Alexander Isaacs to the amount of $14,730; and George N. Miller to the amount of $14,730. These items in the report were not excepted to. The Circuit Court confirmed the report April, 1878, and upon appeal to this court April, 1879, the Circuit decree was affirmed, except as to the extent of the estoppel resulting from funding coupons, as to which the court set aside the conclusions of the Circuit judge, to the extent that it conflicts with the conclusion just stated—"*subject to the modifications hereinbefore indicated, the decree of the Circuit Court should be affirmed.*"

The case as directed went back to the Circuit. A second reference was ordered January, 1880, "to inquire and report what bonds and coupons of said company issued under the act of 1856, *are entitled to priority of payment under the principles settled by the judgment of* 1879, the amount of bonds and coupons issued under the act of 1856, not entitled to priority; what coupons under the act of 1856 have been funded; the number and value of said coupons, by whom and under what circumstances they were funded," etc.

While holding the reference under this order, it is alleged that facts were "satisfactorily ascertained" by some of the counsel, before overlooked, which led them to make a motion on March 30, 1881: "That so much of the report of the Hon.

Wm. A. Pringle, referee, of July, 1877, as relates to the coupons of the six per cent bonds of the Charleston and Savannah Railroad Company guaranteed by the state, produced before him in the names of Alexander Isaacs, George N. Miller and James Adger & Co., be *recommitted* to the referee, and that he inquire and report whether the said coupons have, by reason of payment or from any other cause, *lost the rank to which they would otherwise be entitled under the principles of his report, with leave to report any special matter.*"

Upon the hearing of this motion, affidavits were submitted stating in general the facts to be as follows: The company was required by the act of 1869 to pay in cash the interest due on the bonds of 1856 from and after 1870, and in default of payment the comptroller-general was authorized *to take possession of the road.* When the coupons of 1870, 1871, and 1872 fell due, the company was unable to pay them, and the President, Isaacs, and other friends of the road, agreed to advance the money necessary for that purpose upon condition that they should be allowed to hold the coupons so taken up as security for such advance. The company advertised as if they were about to pay, giving notice that the coupons would be paid on presentation at the First National Bank of Charleston. The parties holding coupons presented them and received the money which they called for, and the coupons were entered as if paid by the company; *but, in fact, the money used belonged to the parties who advanced it.*

The coupons thus apparently paid by the company, but in fact with money furnished by the parties, were delivered uncancelled to the parties, respectively, who advanced the money. When in this suit the creditors of the company were called in, the holders of the coupons thus acquired presented and proved them regularly before the referee, who, as stated, reported as far back as 1877 that *they were proved.* There was no exception to this part of his report, which was confirmed by the Circuit and Supreme Courts.

Under these circumstances, the Circuit judge held that " the question which might have been made at the proper time, was whether the present holders of the coupons, having advanced

their money and paid for them, were entitled as purchasers to stand in the place of the bondholders who got their money? Fraud is not alleged. The opinion of the court is, that the petitioners having neglected to raise the question at the proper time are now too late. It is *res adjudicata*, and there is no sufficient reason for opening the judgment heretofore rendered, even if it were within the jurisdiction of the court. The motion is refused."

Was this ruling error? It is claimed that the matter now proposed to be referred to the referee was never in issue before him, and therefore could not have been decided by him in 1877, when he reported that these coupons were regularly proved and set down as existing demands against the company. It seems that at the time the coupons were proved no special attention was called to the circumstances under which possession of them had been acquired or the question as to their rights in terms made before the referee, but that the parties presented the coupons and proved them in the usual way without objection. The other creditors were all parties and did not suggest that these coupons had in effect *been paid by the company*. It may be that this omission was caused by the unusual mass of testimony and the complicated nature of the questions involved; yet it is undoubtedly the duty of a party to prove his case at the proper time or take the consequences. All matters which were then before the referee, or should have been before, or *were necessarily involved in what was before him*, were then in issue, and must be regarded as having been considered and decided by him.

The court cannot decide matters by halves. "If a defendant has been before a competent tribunal, which has proceeded to *judgment*, that decision, *until reversed*, is conclusive upon him in every tribunal having concurrent or other jurisdiction. It is conclusive upon him as to every matter of defence, not only presented but which could have been presented by him, and it is conclusive upon him, although the judgment be erroneous, if he acquiesce in it and does not proceed to reverse it. *It is conclusive on him because a party whenever he is brought into a court is bound to full diligence, which, if he*

*uses, he will obtain his right—if he neglects either in putting in proper pleas, or introducing all his evidence to support them, he has no one to blame but himself;* nor will his neglect in one court be allowed to give him a right to a second trial either in that court or another." *Maxwell* v. *Connor,* 1 *Hill Ch.* 22. The question of the ownership of the bonds and the right of the claimants to present them as still unpaid by the company, was necessarily involved in the proof of the coupons, which the referee reported had been made, and the judgment must be held to have embraced the very matter now proposed to be considered.

It is said, however, that even if this be so, the judgment was *not final,* as the cause is still in court. It is true that there has been no *final judgment* in the sense that the litigation has been entirely ended. The case has been before this court several times, and at different stages particular questions have been decided, and as to these the decisions were as conclusive and final as if they had been the only questions in the case, *e.g.:* The right of the state to postpone the lien of 1856 was decided by this court in the former judgment, and although the cause upon other points is still before the court that one cannot be again stirred. In cases involving many questions there is danger of the litigation being prolonged, and it is necessary to eliminate, in their order, those fully decided so as to be able to make progress with those still undecided.

In the case of *Boyce* v. *Boyce,* 6 *Rich. Eq.* 302, the court says: "We have numberless adjudications that where a party had an opportunity to except and has not excepted, he cannot again bring the matter either before the master (or the court) on Circuit or on appeal. The principle is essential to the due and orderly administration of justice, and must have a place in every well-constituted forum. If at law a party pleads to special points neglecting other points, he acquiesces in the pleadings of his opponent relating to the points he does not contest; and so here and so everywhere. We have other cases to the effect that if a party appeals he is concluded from considering points not covered by his appeal, and after the

appellate judgment is delivered upon the points to which the appeal refers, he is not at liberty afterwards, in a future proceeding in the case, either on Circuit or in the Appellate Court, *to claim a consideration of the ground he has passed over and lost.* See the opinion of Chancellor Harper in *Britton* v. *Johnson, Dud. Eq.* 28. A party who brings up a partial appeal loses every ground of appeal then existing which he neglects and leaves behind him, and cannot afterwards stir the objections lost by his supineness or acquiescence. The court is constrained to say that this objection comes too late. The report of the commissioner was made in 1842. Many exceptions were taken, but no objection was made on this ground. So far as the exceptions made were not sustained that report became the judgment of the court. The door of litigation must at some time be closed." *Huson* v. *Wallace,* 1 *Rich. Eq.* 1.

Considering the matter now agitated as necessarily embraced in the report of the referee, and determined by the orders therein, was it error to refuse to set aside that judgment and order it re-examined?

The application cannot be considered as made under the act now repealed, " To vacate and set aside erroneous judgments," for the reason that it was not made within two years after the judgment rendered. It cannot be considered as made under Section 197 of the code, for the reason that said section was intended only for the relief of parties who, by reason of some "mistake or inadvertence," etc., may have lost the opportunity of being present at the trial, or to be represented there, and for the additional reason that the motion was not made within one year. As an application for a new trial upon subsequently discovered evidence, the Circuit judge had no right to entertain the motion after the *remittitur* from the Supreme Court on the judgment, covering the point decided, had gone down to the Circuit Court. *Cothran* v. *Knox, ante, p.* 207.

But, finally, it is urged that this motion was an appeal to the large equity jurisdiction of the Circuit judge sitting as chancellor ; that as long as the cause is still pending, and the court in possession of the fund, it is competent for the court

to correct any error which may have occurred, and to make any order necessary for the correct ascertainment of the rights of the parties. There is no doubt that the Court of Equity, in the interest of justice, exercises large powers before a matter has been finally decided, as in the case of *Gist* v. *Gist, Bailey's Eq.* 343, but that court does not undertake to ignore the principle of adhering to former decrees. On the contrary, some of the strongest cases on the subject originated in that jurisdiction. No case has been cited where the Court of Equity, after the court of last resort had finally decided a matter, has for any reason whatever disregarded the well-established principles of *res adjudicata.*

From the view which we take it is not necessary to touch the merits of the application, but we may say that where an appeal is made to the court to put forth its extraordinary chancery powers and grant equitable relief, the party may with propriety be required to submit to the rule which makes it necessary to do equity in order to get equity. In such case the appeal does not proceed upon strict right, but is addressed to the equitable conscience of the judge, which will not be exercised except for the purpose of preventing a manifest wrong. As stated in the case of *Gist* v. *Gist, supra,* "the court is always reluctant, *where the case is in its power*, to exclude any apparently just claim or defence."

In this case the Circuit judge was not impressed with the equity of the claim. Without reference to the legal defence of payment, if the company had seen fit to make it, and insist upon the transaction as it appeared on the books, and not as it really existed, we concur with the Circuit judge that the equities of the parties who made the advances to take up the coupons in this case are substantially the same as they were in *Ketchum* v. *Duncan*, 96 *U. S. R.* 659.

What Chief Justice Waite said in *Claflin* v. *The South Carolina Railroad Company*, 8 *Fed. Rep.* 118, may not be inappropriate here: "The next question is whether, as between the bondholders and the Syndicate, the coupons were *bought* or *paid.* I shall not undertake to recapitulate the evidence on this point, but content myself with saying that the

evidence, as I think, brings the case clearly within the rule laid down by the Supreme Court in *Ketchum* v. *Duncan.* Certainly there can be no claim of bad faith on the part of the Syndicate. . . . The arrangement was in every respect fair and honorable. All the members of the association were directors and members of the finance committee of the board. They were to be paid nothing for their services or the risk they assumed. So far as it appears, they were in no condition to be personally benefitted by what was done, and in all the mass of testimony not a word is to be found reflecting on their integrity in the matter. There is nothing whatever in the case to show that the transaction was anything else than a laudable effort on the part of the directors to tide the company over what was supposed to be but a temporary embarrassment, brought about by an unexpected falling off of business, with the hope that upon a revival of business a disastrous failure might be avoided. The bondholders have lost nothing. The money they got when they gave up their coupons is certainly worth as much as their security under the mortgage would be to them now."

So much of the Circuit decree as relates to the subject under consideration is affirmed.

VI. *The next question is as to certain debts contracted by the receiver, and called in the Circuit decree "Claims of Material Men."*

The referee reported that the accounts against the receiver were classified as follows—viz., 1. Notes payable, $4311.62; 2. Open accounts on ledger, $4116.97; 3. Transient creditors, $6796.35; 4. Pay-rolls, $2368.53; 5. Balances due connecting roads, $5728.24; and recommended that they be paid from the proceeds of sale.

The Circuit judge confirmed the report and ordered them first paid. The fourth item, including amounts due to employees on the "Pay-rolls," was paid by consent of all parties on account of the necessities of men who earn their daily bread; but the payment of the other claims is strenuously resisted on the ground that the functions of the receiver, Mitchell, were limited to "income," and that miscellaneous

debts contracted by him are not chargeable on the corpus in preference to the mortgages, unless specially provided for in his appointment or subsequent order of the court.

The doctrines relative to the rights and duties of railroad receivers, and debts contracted by them, are comparatively new. They have grown up with the growing importance of railroads within the last few years, and even now are only in the process of development. Some principles, however, may be regarded as settled, but there are others still in controversy. It may be regarded settled that the receiver is merely the executive officer of the court; that his custody is the custody of the court, and that he has no inherent powers independently of the court expressly authorizing acts, or approving them when done. We believe it to be also settled that the court, having taken possession of a railroad, has certain duties to perform, and, among others, will see to the liquidation of all proper debts contracted by its express order or authority; but we are not aware that it has been precisely settled as to what debts contracted by a receiver outside of his express authority the court will undertake to provide for, and more especially in a case where there is no " income," and the property out of which they are to be paid is already under mortgage.

In this case it is admitted that there is no " income," and it is proposed that certain debts contracted by the receiver shall be first paid—not out of any receiver's fund from profits, but out of the proceeds of sale, thus giving them an equity over the mortgage bondholders. The order appointing Mitchell receiver did not give him the right to contract debts and charge them upon the *corpus*. It contemplated income, and provided that "the net proceeds, after paying all necessary expenses, including such accounts, if any, that may be due the employees and officers," should be applied quarterly to the payment of certain mortgage debts. We agree with the referee that " it would require a very liberal construction of this order to interpret it as intending that the necessary expenses, including the accounts due the employees and officers for services, *should be paid out of any other fund than the profits of the*

*road.* If the amounts now due by the receiver are at all chargeable upon the fund arising from the sale of the road now in the hands of the court, such chargeability must arise from some other authority than that contained in the order appointing the receiver."

This would seem to dispose of the whole matter, but it is strongly urged upon us that these are meritorious claims, and have a special equity on account of their character; that the order appointing the receiver gave him authority "to hold, work, and manage the road with the greatest possible skill and economy," and that having done so, producing debts instead of profits, the court should take care of its own officers, and order them paid out of the property mortgaged to others. It was the duty of the receiver to keep his current expenditures within the current income, and if he could not do so he should have reported to the court, and asked leave to contract debts on the faith of the property. This would have given the parties in interest an opportunity to be heard upon the question whether a receivership should be continued which was not clearing expenses.

Many authorities have been cited as to what are proper allowances in a receiver's account, which are undoubtedly correct; but none of them, so far as we can discover, clearly mark the line which is important between "income" and "corpus." When general reference is made to the "receiver's fund," or the "trust fund" in the hands of the court, or "funds to the credit of the suit," we infer that the funds meant arose from "income," as nothing else can with any degree of appropriateness be called the "receiver's fund."

The referee rests his judgment on the case of *Cowdrey* v. *Railroad Company*, 1 *Wood*, 336 (also reported in 11 *Wall.* 459, and 3 *Otto*, 352), and the Circuit judge relies on the authority of *Myer* v. *Car Company*, 102 *U. S.* 13. In both these cases questions were discussed as to what expenditures should be allowed the receiver out of the "trust fund" under the control of the court, or out of "the fund to the credit of the suit;" but it does not appear whether such "trust fund" arose from "income" or the sale of the property. These cases

do not decide the precise question here, and, therefore, can give us little assistance. We may concede that under the authority of these cases, and others, these claims would be allowed if there was a fund from "income" out of which to pay them; but there is no such fund, and the question recurs, Shall they be paid out of the proceeds of the mortgaged property against the protest of the mortgagees?

In this vague state of the authorities, we are obliged, though with some hesitation, to render our own unaided judgment on the subject. A mortgage has a lien upon the property itself, but, without special provision, no lien upon the income. The mortgagor is entitled to the use and rents and profits until an order of foreclosure. He may use this income in working the property, paying current expenses, or in any other way; but he has not the power to give any liens upon the corpus for any purpose whatever, even that of cultivating or operating the property itself, which will postpone liens already fixed upon it. Any debts he may contract must take their place behind liens already resting upon the property. There may be cases where the court will declare an equity on account of additions made to the value of the property; but such are exceptional cases, and proceed upon different principles. When the court takes the place of both the mortgagor and mortgagee, and takes possession of an insolvent railroad by appointing a receiver to preserve it and make it profitable pending litigation, it has been established as a rule to allow the receiver to pay the necessary expenses of running the road, including damage to persons and property inflicted in so doing, out of the *income* in his hands called the "receiver's fund." *Ex parte Brown, in re Gibbes* v. *G. and C. R. R. Co.*, 15 *S. C.* 518.

This is manifestly just, as the mortgage only covers the corpus, and the mortgagee has no right to the income until current expenses are paid. It would clearly be inequitable to allow the receiver to use the labor of the employees and then turn over all the fruits to the mortgagees, leaving them unpaid. In administering this equity, the courts have gone so far in providing for the payment of current expenses as *even to recall* any income that may have been paid to the mort-

gagees, and in that way temporarily *diverted* from the payment of the expenses.

Chief Justice Waite, in the case of *Fosdick* v. *Schall*, 9 *Otto*, 251, thus states the doctrine: "The income out of which the mortgagee is to be paid is the net income obtained by *deducting from the gross earnings* what is required for necessary operating and managing expenses, proper equipments, and useful improvements. Every railroad mortgagee, in accepting his security, impliedly agrees that the current debts made in the ordinary course of business shall be paid *from the current receipts* before he has any claim upon the income. If, for the convenience of the moment, something is taken from what may not improperly be called *the current debt fund*, and put into that which *belongs to the mortgage creditors*, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require, as a condition of such an order, that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before anything derived from that source go to the mortgagees."

But it seems to us that as a general rule this equity must be limited to the existence of *income*. The very fact that it is thought necessary to invoke the doctrine of *diversion*, shows that in this respect there is a difference between "income" and "corpus." As the mortgagor himself could not contract debts to displace liens upon the *corpus*, it is not clearly perceived how the court can give that effect to debts contracted by the receiver, who has nothing whatever to do with the finances of the company except the money which arises from the "income." Possibly the court might do so in an extraordinary case, where it clearly appeared that the debt was contracted at the instance of the mortgagees and for their benefit, but not in an ordinary case of excess of expenditures over income, without express authority to contract debts upon the faith of the property. "The extent of this power is measured by the absolute necessity of the expenditure for the protection of the property of which the court has taken charge." *Jones on Railroad Securities*, § 542.

The possession of a railroad by a receiver changes no right of ownership; perfects title to no part of it; gives no new or additional right to any part; but is merely a holding by the same title, subject to the same contracts, limitations, and conditions under which the railroad company held the property at the time the court took possession. It is said in the case of *Fosdick* v. *Schall, supra,* that "the court will do what—if a receiver should not be appointed—the company itself ought to do." It is true that in the same case it is also said that "while ordinarily this power is confined to the application of the income of the receiver, cases may arise where equity will require the *use of the proceeds of the sale* of the mortgaged property in the same way," etc. What cases were here referred to we do not know; but, without going into that, it is enough to say that we see nothing in this case which takes it out of the category of ordinary cases, in which the receiver, without the express authority of the court, has contracted debts, having no income in his hands to pay them.

We have no reason to doubt that these are meritorious claims, and regret that there are no "profits" out of which they could be paid. If it were proper for the court to express a wish, it would be that they could be paid, but they are not receiver's certificates issued by the express order of the court for a particular purpose. They are simply debts contracted with the receiver, limited in authority, of an insolvent railroad, known to be covered with mortgages and not making expenses. We are not satisfied that there is any principle which would authorize the court, overlooking the terms of its previous orders, to transpose legal priorities and order these debts paid out of the proceeds of property bound by prior mortgages.

So much of the Circuit decree as orders the claims against the receiver to be paid out of the proceeds of sale in preference to the mortgage bondholders, is reversed. And this disposes of the claim of Daniel Green for damages for a horse killed and mule injured by the train, while the railroad was under the control of the receiver. If the damage was negli-

gently done, this claim ranks as high as other debts of the receiver; but it is not a lien to take priority, and there is no "receiver's fund" out of which it can be paid.

*VII. The claim of Charles T. Mitchell for cost of construction of the Bee's Ferry extension.* Upon application of the receiver, Charles T. Mitchell, on July 11, 1877, Judge Reed ordered: "That the said railroad company be and hereby is authorized to construct, or cause to be constructed, a new track from the John's Island Station to Bee's Ferry, and to build a suitable bridge over the Ashley river at that point, as recommended in and by the report of Mr. Gadsden, and *at a cost not exceeding the estimate appended hereto* ($32,846.20). "That the cost of said track and bridge *be paid out of the surplus income of the road,* after paying current expenses, repairs, and other charges already upon it; and the same when built and paid for at the cost of construction, shall be subject to and covered by the present liens according to their priority, etc., as shall any agreement with the Ashley River Company, or other persons for the use of their property. And until the works hereby ordered shall be paid for, *in the manner provided aforesaid, they shall be and stand as a security for such persons as shall furnish* material or construct them, or shall advance, or loan money, for such material and construction," etc.

Most of the attorneys representing mortgaged bondholders assented, but James Conner, owning $11,500 of six per cent bonds, objected to this order and appealed from it. The Supreme Court stating that "the propriety of the order can only be considered as it regards parties who did not assent to it," adjudged that "the order as to the appellant must be set aside." 10 *S. C.* 411.

Notwithstanding the decision of the Supreme Court that the alleged authority to the receiver was without the approbation of the court, the work of constructing the new track and bridge went on, and the money used for that purpose was furnished chiefly by the South Carolina Loan and Trust Company and the First National Bank of Charleston. It was advanced on notes of the company indorsed by Mitchell individually.

No money was paid towards the extension out of the *surplus income* of the road, as the order directed, but the debts remained unpaid and were growing by the accumulation of heavy interest.

On July 11, 1879, Mitchell filed a petition in the case praying for the payment of the moneys lent to him for the aforesaid purposes. The banks which had loaned the money answered the petition, putting forward their claims, and James Conner, a bondholder, also answered, objecting. It was referred to master Clancy " to ascertain and report the amount expended for the construction authorized by the order, and what amount is due upon the lien thereby created," etc. Master Clancy reported, that the cost of construction was $42,941.14. Mitchell excepted, and Judge Pressley filed a decree fixing the amount due on "the lien claimed by the petitioner at the sum of $42,941.14, with legal interest thereon from October 1, 1877, when the work was completed."

It seems that after having the cost ascertained as above, Mitchell proceeded no further in his effort to foreclose his lien on *the extension* considered as a *separate piece of property.* On January 9, 1880, the whole road "included in the several deeds and mortgages proved in these cases," was ordered to be sold. An appeal was taken, which was dismissed. 13 *S. C.* 469. On January 7, 1880, the road was sold for $300,200. At the sale, no notice of any kind was given by the claimant, Mitchell, or any one else. It was referred to master Porter to report whether, under the sale made, the Bee's Ferry extension and bridge were sold, and what proportion of the purchase money Bee's Ferry junction and bridge *bears in value to the whole road.* Master Porter reported that the extension and bridge were included in the sale, and that the said branch had been in operation about two and one half years previous to the sale, and also "that upon the whole testimony his conclusion is that the extension and bridge added to the road a value equal to the cost of construction, and that the cost is the proper measure of the proportion in value it has to the purchase money of the whole road."

To this report exceptions were filed, and Judge Mackey

*ordered* that "$42,941.14, with interest from October 1, 1877, be paid from the proceeds of sale to the South Carolina Loan and Trust Company, the First National Bank, and The People's National Bank, in proportion to the debts which they held of the receiver under the lien, any surplus to be paid said receiver, C. T. Mitchell. As to the costs and expenses incurred by the receiver in defending this order of the court, he ought to be fully protected, and these should, therefore, be paid, together with the debt, from the proceeds of the sale, *in preference to other claims*," etc.

The question now is, Was this error? Under a former order of the court, Mitchell had been appointed receiver, "to hold, work, and manage the road," and after discharging current expenses, to pay "the net profits" to certain mortgage bondholders. It can hardly be necessary to say, what has been so often held, that the objects for the appointment of a receiver are temporary in their character. It is not intended that the receiver should be permanent, and like the owner of property, look to remote advantages, or make permanent improvements; but simply preserve the property and make it profitable pending litigation. The receiver, as such, has no power or duty outside of the order of the court. *See* 10 *S. C.* 407, *supra.*

It is manifest that the order appointing Mitchell receiver did not authorize any such expenditure as that for the Bee's Ferry extension. Judge Reed's order of 1877 did in terms give such authority. That order, however, was granted, without reference, upon the consent of the counsel representing most of the bondholders, and was declared by the Supreme Court to have been improvidently granted, was set aside as to James Conner, the party contesting it, and left undisturbed as to the other parties, only for the reason, that being a *consent order*, it was in effect simply the agreement of the consenting parties. Mitchell, therefore, in building the Bee's Ferry extension, was not really acting as receiver, under authoritative orders of the court, but as agent of the consenting bondholders.

"When the object of a receivership has been accomplished,

and the occasion for it no longer exists, but it is nevertheless continued in form and manner, *by consent of the parties in interest*, the managing party is not regarded as a receiver, in the sense of the law, but as having the character and office of an administrator of a trust, by *agreement of the parties.* Consequently, the debts contracted by such manager, although having the formal sanction of the court, cannot be established as receivership liens, but are debts which are *liens* upon the trust property, under the common doctrine that disbursements and expenses properly made are entitled to payment out of the trust property. A decree entered by consent after the occasion for a receivership has ended, for a new and continuing system of tenure and management, does not make the manager the officer and representative of the court, but *merely the agent and representative of the parties. . . .* It is fundamental in every idea of receivership that the court is to have the active and responsible control of the administration. That was not so in this case; but, on the contrary, the whole course in general and in detail was devised and executed by the managers and their associates, without any supposition that the court had any real office to perform, calling into exercise judicial judgment, direction, or control." *Jones on R. R. Sec.*, §§ 548, 549.

So we might say in this case. The Supreme Court not only set aside the order of Judge Reed, so far as it was contested, but afterwards declined to adopt the policy of endeavoring to make additions and improvements of a permanent character through the receiver, as the officer of the court. Of this all the parties had notice, and it cannot fairly be claimed that the court is responsible for the result. *Ex parte Mitchell*, 12 *S. C.* 83.

Considering Mitchell as the agent of the consenting mortgagees, he failed to perform the agreement, both as to the amount of the cost and paying it "*out of the surplus income of the road.*" There is no income, and he now asks to be paid for his entire outlay from the proceeds of the sale of the whole property. The mortgage bondholders insist that their agreement was made *on conditions*, which have not been com-

plied with, and that Mitchell, having failed to perform his part of the agreement, is entitled to no compensation ; that as soon as the extension was built, it became part of the road, and the old lien extended over it, and the road having been sold as a whole, he may have a claim against the company for work done, but no security therefor.

We cannot accept this view to the extent claimed. There can be but little doubt that Mitchell made a valuable improvement to the property, and we think that he had by this agreement of the consenting mortgagees *a lien* on the road he built, according to the terms of the consent order, which provided that " *until the works* (describing them) *shall be paid for in the manner aforesaid, they shall be and stand as for a security for such persons as shall furnish material or construct them, or shall advance or loan money for such material and construction,*" etc. It is true, as matter of law, that the old liens stretched over the extension as part of the road ; but we think it did so subject to the lien of the builder above provided for.

At the sale of the property under the order of court, Mitchell did not object to the extension being sold as part of the road. The whole road, including the extension, was sold, and he has an equity to share in the proceeds of the sale to the extent that the branch built by him enhanced the price which the whole road sold for. We do not mean that he is entitled to what the extension cost, for it is rare that a railroad brings at public sale half the original cost, nor that he is entitled to receive a theoretical estimate of its real abstract value ; but the proportion of the *purchase money* which was produced by his part of the property. If the whole property unfortunately sold for less than its true value, we do not see why he should not be required to share in the sacrifice. He had a case pending in court to sell separately the branch extension, on which he had a lien. He did not, perhaps could not, insist upon a separate sale, but acquiesced in the sale of the whole, which thereby became in part his sale. It was as if the owners of two adjoining lots of land should agree to sell them together, or as if the sale had been made for partition between Mitchell and the consenting bondholders as tenants in common, having un-

equal interests—the bondholders owning the old and Mitchell the new road.

As was said in a former judgment of this court, in this very case, in regard to another local lien created after the mortgages, and substantially analogous to this : " It cannot be doubted that a railroad corporation may mortgage after to be acquired property. *Dunham* v. *Railway*, 1 *Wall.* 259 ; *Pennock* v. *Coe*, 23 *How.* 117 ; *Pierce* v. *Railroad*, 24 *Wis.* 551. . . . But to hold that a railroad company may make a mortgage of land to be acquired so as to defeat a *purchase money mortgage* of land subsequently acquired, stands on an entirely different footing, and cannot be admitted. The Charleston and Savannah Railroad Company having given a *purchase money mortgage* for the land, no obligation or lien affecting that company or its property can be interposed *prior* to such purchase money mortgage. The mortgage of Trenholm and Potter was properly upheld by the decree *as a first lien as to such mortgaged property.* So far as it regards that portion of the mortgaged land that was requisite for the use of the railroad as such, the claims of the estates of Trenholm and of Potter must *be confined to the fund arising from the sale of the railroad as a whole,* and for that purpose there should be an inquiry to ascertain what ratable proportion of the whole fund *arising from such sale* would properly represent the relative value of that portion of the mortgaged land." 12 *S. C.* 365.

In this view there was error in the order of reference upon this question, and it should be recommitted to ascertain *what ratable proportion would properly represent the relative value of the old road and the extension considered only in reference to the purchase money of the whole.*

We have seen that the Bee's Ferry extension was made by agreement with certain mortgagees, acting through a consent order of court. James Conner gave no consent at any time, and his interest was expressly excepted in the contract with Mitchell. Under these circumstances the court cannot exclude him against his protest from the full share that he may be entitled to in the whole proceeds of sale.

It is always embarrassing for this court to attempt to adjust costs and counsel fees, which more appropriately belong to the Circuit Court. It seems to us, however, that in this case there should be some system upon the subject, and that the costs and fees of all the attorneys properly chargeable for successful services should be paid out of the common fund, so as to make the successful litigants pay their proper proportion.

VIII. *The only remaining question is that in reference to the taxes claimed by the state.*

1. The original act of incorporation of 1853 exempted the company from taxation for thirty-six years. 2. The act of 1856, which created the statutory lien to secure the bonds of that date, prohibited the old company from conveying to any person whatever any lien or incumbrance which should come in conflict with said lien. 3. The act of 1866 incorporating the new company required that it should pay the bonds of 1856, and exempted its property from taxation without limit as to time. 4. The act of 1869, purporting to postpone the lien of 1856, contained a provision that the act should not take effect until the new company consented to an amendment of its charter so that its property should be subject to taxation in conformity with the constitution. 5. This act has been declared unconstitutional, but before it was so declared the company, upon the faith of its provisions, had formally accepted it as an amendment of the charter, and that its property should be subject to taxation after January 1st, 1870, at which time the reconstruction of the road was to be finished.

The referee in his first report held that the state had no right to postpone the lien of 1856, and, therefore, no right to exact the payment of taxes, which was the condition upon which the postponement was made. The postponement being beyond the power of the legislature, the exaction of taxes is beyond its right. The Circuit judge concurred with the referee ; but on appeal the Supreme Court, after discussing only the question of *fact* as to whether the road was really *finished* January 1st, 1870, held as follows : " It is evident that this arrangement [with another railroad running into Savannah] put in exercise the franchise of the defendant

corporation to carry passengers and freight, for hire, to its full extent; that is, from the city of Charleston to the city of Savannah. Whether the defendant corporation chose to build and own or lease their right of approach to Savannah, is immaterial to the question of completion within the meaning of the act of 1869. Under such circumstances, the exemption claimed by the defendant corporation cannot be sustained by any reasonable construction of the act of 1869. That portion of the *decree that sustains the imposition of the taxes should be affirmed.*"

When the case went back, the referee and Circuit judge both interpreted the opinion as being a judgment *against the state* as to the taxes, and upon exceptions the point comes again before this court. What is the proper construction of the judgment of the Supreme Court? It is contended on one side that the Circuit decree is in express terms " affirmed," and on the other, it is insisted as confidently that the intention was *to reverse* the Circuit decree. The then chief justice, to whom it was assigned to write the opinion of the court, though generally so accurate, overlooked the character of the Circuit decree which did not *sustain the imposition of the taxes*, but the contrary. The reasoning, which was confined to the subject of *the completion* of the road, seems to indicate one view, and the conclusion another, and, inasmuch as it is impossible to say with judicial certainty what was adjudged, we will consider the question as undecided.

The act of 1853 incorporating the old company, exempted its property from taxation for thirty-six years, and expressly exempted it from the forty-first section of the act of 1841. Under this charter the bonds of 1856 were issued. If the same company had remained in possession of the property and there had been no further legislation, there can be no doubt that both the company and its mortgage creditors could have insisted on the exemption *as a contract*. Whether that exemption was a privilege or a franchise it was such a vested right as a subsequent legislature could not repeal. " It has been held that the legislature has the power to bind the state in relinquishing its power to tax a corporation. It has been

held that such a provision in the charter of a corporation *constitutes a contract* which the state may not subsequently impair. These doctrines have been reiterated and reaffirmed so recently as the year 1871 in an opinion delivered by Mr. Justice Davis, in the case of the *Wilmington Railroad* v. *Bird.* They must be considered as settled in this court." *Humphrey* v. *Pegues*, 16 *Wall.* 249. Assuming this to be settled, we think nothing has occurred sufficient to change those original rights so far as the bonds of 1856 are concerned.

But it is said that the old company to whom the exemption was given has passed away and its property gone into other hands; that the purchasers formed themselves into a new company, chartered in 1866, and that this was practically a forfeiture of the charter and ended the exemption. We do not think that a statutory exemption from taxation, under which as a contract rights have vested, is a mere personal privilege which ends with the ownership of the first taker, if the property, although in other hands, is continued in the same use on account of which the exemption was granted. Besides, in this case, the new company took the place of the old. " The company hereby formed shall assume and be liable for the payment of the *six per cent interest-bearing bonds*, whenever the guarantee of the state has been indorsed, and the lien of the state is in every respect preserved and hereby reaffirmed." The charter of the new company also contained a provision exempting the property from taxation indefinitely.

It is insisted, however, that there has been still another act, that of 1869, which gave to the new company the right to contract a new debt for $500,000, and in order to make it the first lien, pushed back the six per cent bonds already issued, and in consideration of this great boon required the company to give up their exemption from taxation, which they did in form, and in consequence of that relinquishment their property has been legally subject to taxation since 1870. It does not seem to us that this view is sound, for several reasons. In the first place, it is more than doubtful whether the company, that is to say, the stockholders, had the power to give up the exemption without the consent of those who held bonds under

the act of 1856, and which they had received on the faith of the provisions of that act. It would seem a remarkable instance of vested rights doubly violated, if the security afforded to the six per cent bonds by the exemption from taxation of the property mortgaged could be given up upon the consideration of a still greater wrong, the postponement of the lien itself. But, without pursuing that, the conclusive answer is that the act of 1869, which required the relinquishment, having been declared to be unconstitutional, the scheme of postponement failed. The part of the act which gave a benefit to the company as it appeared, and which induced the relinquishment under a mistake, turned out to be a nullity, and the matter remains as if the act of 1869 had never been passed. The consideration of the relinquishment having failed, the state cannot insist upon its enforcement, but must leave the matter as it stood before the act, which failed of its purpose.

It is urged, however, that the consideration of the act has not failed *entirely,* for the reason that it is still enforced as to some parties, and for particular purposes. No part of the act, so far as regards the provision for postponement of the bonds of 1856, has been enforced from any inherent force which it has as a legal enactment; but only from the conduct of parties in particular cases. So far as the state is concerned, the whole provision which undertook to postpone the sixes was, and is, absolutely void. If the act of 1869 was, as declared, unconstitutional, so far as it undertook, with the consent of the company, to postpone the six per cent bondholders in regard to their lien on the property, why was it not also unconstitutional so far as it undertook, with the like consent, to repeal the exemption from taxes? The bondholders had as certainly a vested right in that exemption from taxation as they had in the property itself under their lien. It was not tangible property, but it concerned the value of tangible property. It added largely to their security. The holders of these bonds purchased them upon the assurance that the property covered by the statutory lien would not be reduced in value by the imposition of taxes on it. For this they had the plighted faith of the state, and they are entitled to have it

in that condition against either an attempted relinquishment of the new company, or an effort to repeal it by the legislature.

Upon this question, the case of *Furman* v. *Nichol,* 8 *Wall.* 44, is in point. The exemption in the charter was not personal, but attached to the bonds, just as if the original charter under which they issued were printed on the back of each bond. The state cannot be sued, and on that account should be only the more prompt to do justice, and scrupulous to keep faith. We cannot see that the state has any claim for taxes on the property of the company as against bonds issued under the act of 1856, which are unaffected by estoppel.

The judgment of this court is, that the judgment of the Circuit Court be modified so as to conform to the conclusions herein announced.